**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael Gene PERKINS,
Defendant-Appellant.**

No. 78–5528.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1979.

Theodore L. Tripp, Jr., Tobias Simon, Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Linda Collins Hertz, Alan L. Weisberg, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before THORNBERRY, CHARLES CLARK and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellant Michael Gene Perkins was charged in a two count indictment with importation of cocaine and possession with intent to distribute cocaine in violation of 21 U.S.C. § 952[1] and 21 U.S.C. § 841[2], respectively. The district court, without a jury, convicted Perkins on the former count and acquitted him on the latter. He appeals on the ground that the district court erred in denying the motion to suppress incriminating statements made by the appellant while he was in the custody of the Drug Enforcement Administration. We affirm.

## I. FACTS

On Sunday, January 15, 1978, following an all-night flight from Bolivia, appellant Perkins presented himself to United States Customs authorities at Miami International Airport. Because of appellant's vague answers to questions concerning his travels and occupation and because of the bulky appearance of appellant's coat, the inspector requested a secondary search. Perkins refused to allow a strip search and was taken to Customs Supervisor Basile's office. While speaking with Perkins, supervisor Basile was called to the door to confer with other agents. When he returned to his desk a few minutes later, Basile informed the appellant that a bulge had been noticed in the area of appellant's back. Appellant removed a piece of cloth from inside his shirt, identifying it as a back brace. Appellant then agreed to a strip search which revealed nothing. Approximately ten minutes after Perkins left the office, a package was found beneath the desk at which he had been seated. The package contained a white powdery substance, which was suspected to be, and which tests later confirmed to be, cocaine. Two customs officials testified that nothing was under the desk prior to appellant's arrival. Customs officers boarded an Atlanta-bound flight and took Perkins into custody. Upon deplaning, Perkins was advised of his *Miranda* rights and returned to the customs area of the airport. Perkins testified that he immediately and repeatedly requested counsel, although cus-

1. 21 U.S.C. § 952(a) prohibits importation of controlled substances:

§ 952. Importation of controlled substances—Controlled substances in schedules I or II and narcotic drugs in schedules III, IV, or V; exceptions
  (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter . . .

2. 21 U.S.C. § 841(a)(1) prohibits possession with intent to distribute cocaine:

§ 841. Prohibited acts A—Unlawful acts
  (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

toms officers recalled no such request. When presented with a rights waiver form, Perkins declined to sign it, and he was not interrogated by customs agents.

Shortly thereafter, DEA Special Agents Goodman and Cairo assumed custody of Perkins. Although Goodman again advised Perkins of his *Miranda* rights, testimony is conflicting as to whether Perkins requested a lawyer at that time. The officers informed Perkins he was under arrest and explained the charges and possible penalties to him. Agent Goodman told Perkins that the case could involve any one of several situations: appellant might have been acting alone; he might have been acting in the capacity commonly known as a "mule"; or he might have been acting as a principal with one or more partners. Agent Goodman further stated that the government would be interested in his cooperation, if others were involved in the case, and that any cooperation given by him would be made known to the probation office during preparation of the presentence investigation report, and would be made known to the court at the time of sentencing.

After this initial explanation by the agents, Perkins denied any involvement with the cocaine. Goodman then described procedures that would be used to identify fingerprints on the cocaine package and to match fibers on the package with those on the elastic rib belt worn by Perkins.

At that point, Perkins announced, "I think I want to talk to a lawyer." Agent Goodman said, "Fine," and handed him a Miami Yellow Pages of the local telephone directory which Perkins examined briefly. Perkins then initiated a conversation by asking, through hypothetical questions, the penalties for various degrees of importation involvement. This conversation continued for forty-five minutes, with Perkins continuing to ask all substantive questions at a hypothetical level, while at the same time denying his personal involvement. The discussion was terminated by Agent Cairo's remark to the effect that nothing was getting resolved.

When Agent Cairo announced that the hypothetical discussion had ended, Perkins asked "Well, what happens now?" The agents told him they would call the Assistant United States Attorney who was on duty for that day, and request that the Assistant call a United States Magistrate to set a bond. To Perkins' inquiry as to what type of bond would be set, the agents answered that they had no control over the bond except to make a recommendation. They stated that the magistrates ordinarily set cash or surety bonds in cases of a weekend arrest involving a substantial quantity of cocaine,[3] and advised Perkins that the bond might be modified the following morning at the bond hearing before the magistrate. Perkins then inquired whether he could receive a personal recognizance bond. The agents informed him that such a bond might be recommended by the government, if a party charged with importing a narcotic agreed to cooperate, and if it was necessary for him to travel outside of the state to effectuate that cooperation. It was then that Perkins acknowledged his guilt and gave details of the offense, including the identity of the Georgia resident who had furnished the name of the Bolivian connection. The magistrate set Perkins' bond at $10,000 surety which was reduced the following morning to a $5,000 personal surety bond.

After a hearing, the magistrate recommended denial of appellant's motion to suppress evidence of his confession, which recommendation was approved by the court. A renewed motion was denied by the court at trial. A motion to suppress the contraband due to illegal arrest was filed the morning of the trial. It was, at the suggestion of defense counsel, heard in conjunction with the trial, but denied.

The issue on appeal is the admissibility of the confession. Appellant contends that his confession was obtained both unlawfully, pursuant to an illegal arrest, and involuntarily, pursuant to subtle coercion following his unequivocal request to postpone interro-

---

**3.** Perkins was accused of importing 984 grams of cocaine.

gation until he obtained counsel. Alternatively, appellant argues that the totality of the circumstances precluded a finding of a knowing and voluntary waiver of the right to confer with an attorney. We reject each contention.

## II. *PROBABLE CAUSE*

■ Perkins first asserts that his arrest was illegal, not being based on probable cause and thus his confession was unlawfully obtained. The facts here comply with the definition of probable cause "as a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *United States v. Wynn*, 544 F.2d 786 (5th Cir. 1977). *See also Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

The defendant was returning from a brief visit to Bolivia, a source country; he gave suspicious answers to questions posed by Inspector Bickford; he was wearing a bulky coat; he initially refused to be searched; a bulge was observed in the back of his shirt; he removed what was purported to be his back brace; and within fifteen minutes after he had left the Customs office, a package containing cocaine was found beneath the desk at which he had been sitting. The cocaine had not been there prior to his arrival. In view of all the facts known to the customs officers,[4] there was probable cause to believe that Perkins placed the package under the desk.[5] The arrest was lawfully made.[6]

## III. *ADMISSIBILITY OF THE CONFESSION*

Appellant further urges that his confession was inadmissible because the hypothetical discussion held after his request for counsel constituted an impermissible interrogation under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In *Miranda* the Supreme Court held: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." However, the Court also stated: "(v)olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.* at 478, 86 S.Ct. at 1630.

In the present case, it is undisputed that Perkins made an unequivocal request for counsel. However, there is disagreement as to when this request was actually made. The magistrate found that Perkins did not request counsel until after the DEA agents concluded their initial statements concerning the charges and procedure to be followed and informed him of the fact that any cooperation would be made known to the court and that physical evidence would be sought. The magistrate further found:

> Upon the statement by Perkins that he thought he wished to talk to a lawyer, the Agents ceased speaking with him, except to furnish him with a telephone directory. Perkins thereafter initiated a discussion with the Agents, lasting approximately forty-five minutes, during which he asked questions, which the agents answered. . . . [T]he discussion was neither initiated by the agents nor controlled by them, since the questioning was done by Perkins.

We must accept these findings, adopted by the district court, unless they are clearly erroneous. *U. S. v. Cruz*, 581 F.2d 535, 540–41 (5th Cir. 1978) (en banc). After carefully considering the record before us, we cannot conclude that these findings are clearly erroneous.

---

4. Collective knowledge of the agents working on the case where there has been some degree of communication between them may be considered. *Moreno-Vallejo v. U. S.*, 414 F.2d 901, 904 (5th Cir. 1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970).

5. *See United States v. Klein*, 592 F.2d 909 (5th Cir. 1979); *United States v. Forbicetta*, 484

F.2d 645 (5th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974).

6. Perkins does not challenge his initial detention or search nor could he. *E. g., United States v. Himmelwright*, 551 F.2d 991, 995–96 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

The question thus becomes whether the hypothetical discussion initiated by appellant after his request for counsel was a waiver of his right to remain silent until an attorney was present and whether his subsequent incriminatory statements were made voluntarily.

In *U. S. v. Priest*, 409 F.2d 491, 493 (5th Cir. 1969), the Fifth Circuit held:

Where there is a request for an attorney prior to any questioning . . . a finding of knowing and intelligent waiver of the right of an attorney is impossible . . . [T]he suspect has an absolute right to delay interrogation by requesting counsel. If such a request is disregarded and the questioning proceeds, any statement taken thereafter cannot be a result of waiver but must be presumed a product of compulsion, subtle or otherwise.

In *Nash v. Estelle*, 597 F.2d 513 (5th Cir. 1979) (en banc), we construed *Priest* to bar inquiry as to waiver if questioning proceeds, despite a suspect's *unequivocal* request for an attorney, but not to bar inquiry as to waiver where the suspect merely seeks assurances of his right to counsel at a later stage.[7]

Perkins characterizes his hypothetical discussion with the DEA agents as an indirect attempt by them to gain information as to matters about which he had indicated he did not wish to speak. In *U. S. v. Massey*, 550 F.2d 300 (5th Cir. 1977), we condemned an agent's efforts to continue *interrogation* by indirect means after the suspect invoked his right to counsel. We expressly stated that, unlike here, the suspect did not "voluntarily and spontaneously invite further discussion" about his involvement in the scheme. *Id.* at 308.

The present case can be distinguished on its facts from *Priest, Nash* and *Massey* in that once an attorney was requested by Perkins, all interrogation by the DEA agents ceased. The DEA agents simply responded to questions put to them by Perkins. If there was an interrogation, it was being conducted by Perkins. When an accused initiates the conversation, his statements do not result from "interrogations" and are admissible. *U. S. v. Hopkins*, 433 F.2d 1041 (5th Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971).

In *United States v. Rieves*, 584 F.2d 740 (5th Cir. 1978), DEA agents ceased questioning the defendant when he asked for a lawyer. However, they made several comments to him that any cooperation would be made known to the court. He later volunteered inculpatory remarks. This court held:

When he reinitiated—unprompted by further interrogation—the dialogue with Agent Martinez, he affirmatively demonstrated that he wished to waive his right to remain silent. *Id.* at 745.[8]

Similarly, in *United States v. Anthony*, 474 F.2d 770 (5th Cir. 1973), we held that where the defendant, after receiving *Miranda* warning from an FBI agent, requested an attorney but then initiated a conversation with the agent by asking with what he was being charged, that defendant's right to retained or appointed counsel was waived notwithstanding his earlier request for counsel. The challenged statements were construed to be voluntarily offered words rather than products of the interrogation.

---

**7.** In *Nash*, a suspect after being informed of his rights expressed both a desire for counsel and a desire to continue the interview without counsel. The official conducting the interview made further inquiry to clarify the suspect's wishes. It appeared that the defendant merely sought assurances that his right to counsel at later stages of the criminal process would not be waived if he followed his desire to discuss his involvement in murder with the assistant district attorney. Upon being so assured, defendant twice restated his desire to talk with the

assistant district attorney at that very moment. Under these circumstances, the court held that the assistant district attorney did not violate any right accorded to defendant by proceeding with the interrogation.

**8.** In a footnote the court pointed out that although *Miranda* requires that all interrogation must cease when a suspect expresses the desire to consult with a lawyer, it does *not* mandate that he be given immediate *access* to an attorney. *Id.* at 745, n. 23.

Again, in *U. S. v. Cavallino*, 498 F.2d 1200 (5th Cir. 1974), the court considered a case factually similar to the present one.[9] In affirming the conviction, the court stated:

The trial court concluded that, after Cavallino first expressed his wish to see an attorney, he determined to and did engage in a course calculated to ascertain how much the police already knew and whether there were any prospects of some deal and whether, if he talked, he could limit the consequences of his admissions to the Louisiana crimes; that, having learned sufficient to decide what course he would pursue, he changed his mind about wanting to talk to an attorney and initiated the conversation embracing his incriminatory statements,which did not result from police interrogation. Waiver by a defendant of his constitutional right to consult with or have an attorney present does not require an express statement or disavowal. Waiver may be inferred from the language, acts, conduct and demeanor of a defendant. *Id.* at 1203, 1204.

■ Appellant also argues that his incriminating statements were induced by an illegal promise of reward; that the agents suggested to him that the amount of his bond and sentence would be less if he would cooperate with them. The government contends that Agent Goodman merely stated that if the appellant cooperated with the agents they would so inform the court and prosecuting officials but that they could give no guaranty as to how much help appellant would receive for this cooperation.[10] At issue in *United States v. Klein*, 592 F.2d 909 (5th Cir. 1979), were similar statements made to a suspect which elicited

**9.** After receiving *Miranda* warnings, Cavallino was questioned about a local bank robbery. He denied any knowledge of the robbery and requested an attorney. The interview was terminated and Cavallino was returned to the "booking cage." After meeting with his woman companion at her request, Cavallino asked to see the police officer who had earlier questioned him; he asked what kind of a deal he could make, "if" he had done something and "if" he told about it. After an hour the officer terminated the conversation, telling Cavallino that he was wasting the officer's time, and walked away. Cavallino again questioned the officer and told him that if the woman was released he would tell them what they wanted to know. Cavallino was taken to another room and again read his constitutional rights. He then confessed to the robbery.

**10.** Defense Counsel: Is it correct to say that at the initial confrontation between you as a DEA officer and Mr. Perkins that you advised him that—why don't you tell us what you advised him with regard to the cooperation issue?

Goodman: He was advised that if the situation existed where he could cooperate, that his cooperation would be made known to the United States Attorney handling the case to the probation officer doing a presentence investigation and to the Judge who would handle the case, and that in most cases cooperation is considered very favorably by the Court when it comes time for sentencing.

   .    .    .    .    .

Defense Counsel: Now, is it your testimony, sir, that when you told Mr. Perkins these matters about cooperation, that you did tell him that it would be helpful to him at the time of sentencing?

Goodman: I didn't say it would be. I said that in most cases—I guess I did say—I said that—just a second.

I said that cooperation is usually considered in a favorable light by the sentencing judge.

Defense Counsel: And what did you mean by that?

Goodman: That in most cases it would help him.

   .    .    .    .    .

Defense Counsel: Sir, try to take off your official hat for a moment and explain to us why it is that when two experienced veterans with the police authorities have in custody in a small enclosed room . . .

a 24-year-old college student who has never been arrested before, and you tell him that if you help us we will help you with the Judge when it's time for sentencing; now, I would like to know why that's not a promise and not an effort on your part to elicit his help in return for a promise of leniency.

Isn't the word "help" synonymous with "leniency"?

Goodman: I told him that it could not be a promise because too many factors were involved.

To help, I told him the making of his cooperation known to the Court we would do and we would—but just how much help he would receive and how much relief in the end, there were too many factors involved, depending upon which Judge received the case, and other factors, but I said that everything that he did do would be brought to the Court's attention. R., vol. III, at 218–219, 222–223.

the suspect's cooperation. Here, as in *Klein*, we hold that the agent's statements did not constitute an illegal promise of reward.

■ The undisputed facts reveal that when Perkins requested an attorney, the DEA agents attempted to terminate the discussion. It was Perkins who initiated the subsequent conversation by posing hypothetical situations. While *Miranda* places upon the Government a heavy burden both with regard to inculpatory and exculpatory remarks "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel," 384 U.S. at 475, 86 S.Ct. at 1628, we feel this burden clearly has been met. There is no evidence that the DEA agents interrogated Perkins after his request for counsel nor evidence of any coercion. Neither is there evidence that Perkins did not understand his rights [11] nor that he manifested inconsistent conduct because of confusion.[12] Rather, the record shows that once Perkins requested counsel, the DEA agents immediately halted all discussion and gave Perkins an opportunity to call any attorney he wished. Perkins' subsequent conversation with the agents, which culminated in a confession of guilt, was initiated and controlled by Perkins through the device of hypothetical questions to the agents. The conversation might well have been calculated by Perkins to ascertain the possibility of a deal in return for his cooperation.

Accordingly, because Perkins' arrest was based on probable cause and because his subsequent confession was lawfully obtained and voluntarily given, his conviction is AFFIRMED.

---

**11.** On the contrary, the evidence revealed Perkins to be a fourth year college student, suffering from no physical impairment.

**12.** *See United States v. Nielsen*, 392 F.2d 849 (7th Cir. 1968).