**Billy Russell CLARK, Petitioner–Appellant,**

v.

**Tim MURPHY, Respondent–Appellee.**

**No. 00–16727.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2002.

Filed June 10, 2003.

James M. Jellison argued the cause for the appellant. Anders Rosenquist, Jr., Rosenquist & Associates, Phoenix, AZ, was on the briefs.

Ginger Jarvis, Assistant Arizona Attorney General, argued the cause for the appellee. Janet Napolitano, Arizona Attorney General; Randall M. Howe, Arizona Chief Counsel, Criminal Appeals Section; Diane M. Ramsey, Assistant Arizona Attorney General, were on the brief.

Before: STAPLETON,* O'SCANNLAIN and FERNANDEZ, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Concurrence by Judge STAPLETON.

## ORDER AND AMENDED OPINION

### ORDER

The opinion and concurrence filed on January, 23, 2003, and appearing at 317 F.3d 1038 (9th Cir.2003), are amended. The amended opinion and concurrence are filed herewith.

The panel has voted unanimously to deny the petition for rehearing. Judge O'Scannlain has voted to deny the petition for rehearing en banc, and Judge Stapleton and Judge Fernandez so recommended.

The full court was advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED. No further petitions for panel or en banc rehearing will be entertained.

### OPINION

O'SCANNLAIN, Circuit Judge:

In this petition for writ of habeas corpus, we must decide whether a state court's determination—that the admission into evidence of a murder suspect's confession did not violate the Constitution—was contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court.

### I

On May 15, 1991, Cynthia Tomecko reported to Phoenix police that her mother, Anita Clark, was missing. Police focused attention on Billy Russell Clark, Anita Clark's stepson, when they learned that he had sold her automobile to a California automobile dealership. Clark was arrested on May 24, at about 11:00 a.m., attempting to pick up a check mailed from the California dealership at a post office box in Chandler, Arizona. After the arresting officer read Clark his *Miranda*[1] rights, Clark stated that he understood those rights, and he was taken to the Phoenix police station, where he spent the balance of the day.

The first person to interview Clark was Detective Masino. There is some ambiguity in the record with respect to the size of the interview room, which was either six

---

* The Honorable Walter K. Stapleton, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

feet by eight, or eight feet by ten. It was furnished with a table and two or three chairs. It did not contain a drinking fountain or a toilet. At no time during this interview or the next did Clark ask to use such facilities. The interview with Detective Masino focused on the theft of the victim's car, and lasted approximately 35 minutes. Detective Masino prefaced the interview by asking Clark if he understood his *Miranda* rights, and Clark responded in the affirmative. During the course of this interview, Clark admitted that he had stolen Anita Clark's car, that he had done so for money, and that he had stolen the car on May 14, the day before Anita Clark was reported missing. Detective Masino terminated the interview at approximately 12:45 p.m.

Later in the afternoon, a second interview took place. This time, Detective Masino was accompanied by Detective Chambers, a homicide detective assigned to investigate the disappearance of Anita Clark. The interview began at approximately 4:00 p.m. Initially, Detective Masino conducted the interview, but after about twenty minutes detective Masino left the room and Detective Chambers took over. Detective Chambers identified himself as a homicide detective brought in to investigate the disappearance of Anita Clark, and notified Clark of his *Miranda* rights, reading them verbatim from a standard "rights card" supplied by the Phoenix police department. When the detective asked Clark if he understood those rights, Clark responded "yes, I do."

In the ensuing interview, Clark attempted to provide an explanation for taking his stepmother's car. Detective Chambers responded that there were serious problems with this story. Clark's reply was "I think I would like to talk to a lawyer."[2] Detective Chambers responded as follows:

> I told him if you—if he wanted a lawyer I would call him one. I told him I expected, if in fact he wanted a lawyer and I called him one, our dialogue would be over. I told him that [his sister] was there, I wanted to talk to her. That I was going to leave him alone for a few minutes to make a decision, and that when I returned to him I would expect his answer.

Clark acknowledged that he understood, and Detective Chambers left the interview room to interview Clark's sister. A half hour later, the detective returned to the interview room. Clark spoke first. He told the detective that he did not want a lawyer, and that he wanted to continue talking, adding by way of explanation that it was helping him to deal with the situation by talking to the detective.

The interview continued. After another twenty minutes Clark said to the detective, "should I be telling you or should I talk to a lawyer?" The detective's response was "are you asking for my personal opinion or my professional opinion?" Clark responded that he wanted the detective's opinion, should he be talking to a lawyer or should he talk to the detective? After a long silence of two minutes or so, the detective told Clark that in his personal opinion, should the case go to trial, a judge or a jury would be concerned with remorse. Using his hands as scales to illustrate his

2. There is some inconsistency in the record as to the precise phrasing Clark used. Testifying at the hearing on Clark's pre-trial motion to suppress the confession, Detective Chambers "quoted" Clark as stating "I think I would like to talk to a lawyer" and "I think I'd like to talk to a lawyer." The Arizona Court of Appeals considered Clark's constitutional challenge based on the former phrasing, as did the district court. We do the same. We note, however, that nothing in our analysis hinges on a distinction—if indeed there is any—between "I think I would like to talk to a lawyer" and "I think I'd like to talk to a lawyer."

point, the detective told Clark that the judge or jury would weigh fear of punishment as against any remorse over what happened, and that in his [the detective's] opinion, remorse should outweigh fear of punishment. Clark responded, "well, let's talk about it then."

Soon after, Clark confessed to murdering his stepmother. He described how he found Anita Clark at home when he had not expected her to be there. They apparently had an argument, and Clark told the detective how he had taken hold of her head and snapped her neck, and how she collapsed immediately on the floor. He told the detective that after he realized what he had done, he panicked, placed her body into the trunk of her car, and drove out to the desert to dispose of the body. Later that night, Clark led detective Chambers and another homicide detective, Bob Mills, to the burial site, which was approximately 67 miles outside Phoenix, near Tumbleweed, Arizona. There, Clark led the detectives to the burial site, where they found the charred remains of Anita Clark.

Clark was indicted on one count of first degree murder and one count of theft. Before trial, Clark moved to suppress his confession, claiming it was taken in violation of *Miranda* and its progeny, and that it was involuntary. The motion was denied, and the confession was admitted at trial. Clark's position at trial was that he was lying when he confessed to the police. He admitted to burning and burying his stepmother's body and then stealing and selling her car, but he maintained that he did not kill her. He alleged that he discovered his step-mother's body in the hallway, that he thought his father had killed her, and that he disposed of the body in order to protect his father. The jury convicted Clark of second degree murder, and theft of property. Clark was sentenced to consecutive, maximum, aggravated terms of twenty years imprisonment on the murder conviction, and ten years for theft.

On appeal to the Arizona Court of Appeals, Clark alleged that the trial court erred in denying his motion to suppress the confession, because it was taken in violation of *Miranda*, and it was involuntary. The Court of Appeals affirmed the convictions. The Court of Appeals found that the statement "I think I would like to talk to a lawyer" was ambiguous, and therefore the police were not required to cease questioning. It further found that, considering the totality of the circumstances, Clark's statement was voluntary. The Arizona Supreme Court denied review.

Clark filed a petition for writ of habeas corpus in the United States District Court for the District of Arizona, raising the same grounds for relief as were raised in state court. The case was referred to a magistrate judge, who issued a report and recommendation in January, 1998. The magistrate concluded that Clark made an unambiguous request for counsel, and that it was unreasonable for the state court to hold otherwise. The magistrate nonetheless found that Clark was not entitled to relief because he had subsequently waived his right to counsel. He also found that the statement was voluntarily given. The district court rejected that part of the magistrate judge's report which found that Clark had made an unambiguous request for counsel. The court concluded that the Arizona Court of Appeals' finding that Clark's statement was ambiguous was not contrary to or an unreasonable application of clearly established federal law. The district court further found Clark's confession was voluntary, and there was no due process violation in admitting it at trial.

Clark filed a timely notice of appeal. On August 18, 2000, the district court entered an order denying a certificate of appeala-

bility, stating that probable cause did not exist for the appeal. Our court granted a certificate of appealability on February 21, 2001 on the issue whether the state trial court erred by denying Clark's motion to suppress his post-arrest statements because (1) they were obtained in violation of his *Miranda* rights, or (2) they were involuntary.

## II

### A

A district court's decision to grant or to deny a petition for habeas corpus is reviewed de novo. *Dows v. Wood,* 211 F.3d 480, 484 (9th Cir.2000). Clark's petition was filed in March, 1997, after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, AEDPA's provisions apply, and our review is limited by the standard set forth in 28 U.S.C. § 2254(d). Under AEDPA, we may not grant federal habeas relief unless we conclude that Arizona's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has said that § 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy,* 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (per curiam). This deferential review in habeas cases is premised on the fact that the state courts, as part of a coequal judiciary, are competent interpreters of federal law deserving of our full respect. *See Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■ In *Williams,* the Supreme Court made it clear that the "contrary to" and "unreasonable application" clauses have distinct meanings. *Id.* at 404, 120 S.Ct. 1495. A decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id.* at 413–14, 120 S.Ct. 1495.

■ A state court's decision involves an unreasonable application of federal law if "the state court identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. In *Williams* and in subsequent decisions the Supreme Court has repeatedly emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 120 S.Ct. 1495 (emphasis in original); *Penry v. Johnson,* 532 U.S. 782, 793, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) ("Even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable."); *Woodford,* 123 S.Ct. at 360 (a federal court may not "substitut[e] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."); *Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002) (per curiam) (holding that habeas relief is not proper where state court decision was only "merely erroneous").

Finally, two points of clarification with respect to our treatment of habeas petitions are necessary in light of recent Supreme Court precedent. The first issue is the standard for determining whether application of federal law by a state court is unreasonable for purposes of granting relief under AEDPA. In *Van Tran v. Lind-*

*sey,* 212 F.3d 1143, 1152–54 (9th Cir.2000), we held that, under AEDPA, a state court's decision is an "unreasonable application" of clearly established federal law if "clear error occurred." In *Lockyer v. Andrade,* —— U.S. ——, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court made it clear that this standard fails to give proper deference to the state courts. The Supreme Court explained,

> The Ninth Circuit made an initial error in its "unreasonable application" analysis. In *Van Tran v. Lindsey,* 212 F.3d at 1152–54, the Ninth Circuit defined "objectively unreasonable" to mean "clear error." These two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness. *See Williams v. Taylor, supra,* at 410, 120 S.Ct. 1495; *Bell v. Cone,* 535 U.S. at 699, 122 S.Ct. 1843.
>
> It is not enough that a federal habeas court, in its "independent review of 'the legal question" is left with a "firm conviction" that the state court was "erroneous" 270 F.3d at 753 (quoting *Van Tran v. Lindsey, supra,* at 1153–54). We have held precisely the opposite: "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411, 120 S.Ct. 1495. Rather, that application must be objectively unreasonable.

*Id.* at 123 S.Ct. at 1174–75.

■ We follow, as we must, our marching orders from the Supreme Court, and now hold that a reversal is warranted under AEDPA's "clearly erroneous" provision only if the state court's application of federal law is *objectively* unreasonable. *Id.; see also Cook v. McKune,* 323 F.3d 825 (10th Cir.2003) (" 'Unreasonableness' is gauged by an objective standard."). The writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than we have previously afforded them. This much, at least, is obvious, particularly in light of the Supreme Court's rejection of the "clear error" standard for issuance of the writ.

The Supreme Court clarified another aspect of our habeas jurisprudence in *Lockyer.* Our precedents formerly required a two-step inquiry under AEDPA; we first asked "whether the state court erred at all," *Anthony v. Cambra,* 236 F.3d 568, 578 (9th Cir.2000), and assuming the answer was yes, only *then* did we apply AEDPA's standard of review. The Supreme Court rejected this approach,

> The Ninth Circuit requires federal habeas courts to review the state court decision *de novo* before applying the AEDPA standard of review. We disagree with this approach. AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1)—whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law.

*Lockyer,* 123 S.Ct. at 1172.

In *Lockyer,* the Supreme Court "[did] not reach the question whether the state court erred." *Id.* The Court's focus was "solely on whether § 2254(d) forecloses habeas relief." *Id.* Thus, to the extent *Van Tran* and our subsequent precedent *requires* a two-step consideration of habeas

petitions, such precedent has been overruled. Our own independent consideration of the constitutional issue is neither relevant, nor necessary to dispose of the question presented. *See Bell v. Jarvis*, 236 F.3d 149, 162 (4th Cir.2000) (en banc) ("[A]ny independent opinions we offer on the merits of the constitutional claims will have no determinative effect in the case before us, nor any precedential effect for state courts in future cases."); *Valdez v. Cockrell*, 274 F.3d 941, 954 n. 19 (5th Cir. 2001) ("[W]e do not read the . . . Supreme Court cases to require [a] two-step inquiry . . . ."). "[T]he only question that matters under § 2254(d)(1)," *Lockyer*, 123 S.Ct. at 1171, is whether or not the Arizona state court's decision is contrary to, or involved an unreasonable application of, clearly established Federal law.

 In attempting to answer that question, the *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412, 120 S.Ct. 1495. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 1999), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Williams*, 529 U.S. at 412, 120 S.Ct. 1495 ("The . . . statutory language makes clear . . . that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence.").

With these principles in mind, we turn to the merits of the claim.

#### B

##### 1

Clark's primary contention on appeal is that the state trial court erred in admitting his confession at trial because it was taken in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which requires all questioning to cease once an accused requests counsel. Specifically, he argues that his statement, "I think I would like to talk to a lawyer" was an unequivocal request for counsel, and that request went unheeded. His confession should therefore have been suppressed. The Arizona court's decision to the contrary, the petitioner argues, involves an unreasonable application of federal law, and therefore habeas relief is warranted.

Of course, a suspect subject to custodial interrogation has a Fifth and Fourteenth Amendment right to consult with an attorney and to have an attorney present during questioning, and the police must explain this right to the suspect before questioning. *Miranda*, 384 U.S. at 469–73, 86 S.Ct. 1602. When an accused invokes his right to have counsel present during custodial interrogation, he may not be subjected to further questioning by the authorities until a lawyer has been made available or the suspect himself reinitiates conversation. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880. This rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). The "rigid prophylactic rule" of *Edwards* requires a court to "determine whether the accused actually invoked his right to counsel." *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (quoting *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court held that "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determina-

tion whether an accused actually invoked his right to counsel is "an objective inquiry." *Id.* at 458–59, 114 S.Ct. 2350. The suspect must "unambiguously request counsel." *Id.* at 459, 114 S.Ct. 2350 "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* In *Davis*, the Supreme Court found that the statement, "[m]aybe I should talk to a lawyer," was ambiguous, and hence was not a request for counsel. *Id.* at 462, 114 S.Ct. 2350.

■ The Supreme Court in *Davis* specifically declined to extend the *Edwards* prophylaxis to situations where a suspect makes a vague or ambiguous reference to an attorney. *Id.* at 459, 114 S.Ct. 2350 ("If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect."); *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) ("[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*.") (emphasis in original). This is so because if a questioning officer reasonably does not know whether or not the suspect wants a lawyer, requiring the cessation of questioning "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity." *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The *Edwards* rule seeks to "maintain a delicate balance between ensuring that suspects are properly insulated against police overreaching while allowing the law enforcement community to perform its duties effectively." *Smith v. Endell*, 860 F.2d 1528, 1537 (9th Cir.1988) (O'Scannlain, J., dissenting). In sum, unless the accused makes an unambiguous request for coun-

sel, the authorities are free to continue questioning.

■ In *Davis*, the Supreme Court found that the phrase "[m]aybe I should talk to a lawyer" was ambiguous, and therefore the police were not required to cease questioning. 512 U.S. at 462, 114 S.Ct. 2350. In this case, Clark's statement was "I think I would like to talk to a lawyer." The distinction, if indeed there is any, is in the qualifying clauses—"I think I would" instead of "maybe I should." Both phrases are equivocal to some degree, and critical to the Arizona court's determination was Clark's use of the words "I think," which it found equivocal. *See United States v. McLaren*, 38 M.J. 112, 115 (1993) (holding that the words "I think" used by a suspect "could render a request for counsel equivocal"). Given that *Davis* is the *only* word from the Supreme Court as to whether or not a suspect's statement was an unambiguous request for counsel, the Arizona state court's conclusion that Clark's statement was equivocal could hardly be said to be objectively unreasonable.

While *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents. *See Duhaime*, 200 F.3d at 600–01. Our own precedent is not much help since it is somewhat inconsistent on what constitutes an equivocal request for a lawyer. The only case containing the critical words "I think" is *Shedelbower v. Estelle*, 885 F.2d 570, 571 (9th Cir.1989), where we assumed without deciding that the statement "[y]ou know, I'm scared now. I think I should call an attorney," was a valid invocation of the suspect's right to an attorney. However, that case pre-dates the Supreme Court's decision in *Davis*, and nothing in the court's analysis hinged on the presence or absence of the phrase "I think."

Our post-*Davis* cases differ significantly from this case on their facts, and therefore provide little guidance. *See e.g.*, *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir.1999) (finding suspects questions "(1) Can I get an attorney right now, man? (2) You can have attorney right now? and (3) Well, like right now you got one?" constituted an unambiguous request); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir.1999) (holding the statement "What time will I see a lawyer?" not an unambiguous request for counsel); *United States v. Doe*, 60 F.3d 544, 546 (9th Cir.1995) ("maybe he ought to see an attorney" not a clear and unambiguous request for counsel); *United States v. Cheely*, 36 F.3d 1439, 1448 (9th Cir.1994) ("my attorney does not want me to talk to you" in tandem with a refusal to sign written waiver of right to attorney form was an unambiguous request for counsel).

Other circuits to have considered a suspect's statement containing the words "I think" have reached opposite conclusions. In a decision predating *Davis*, the Eleventh Circuit assumed without analysis that the statement "I think I should call my lawyer" was an unequivocal request for counsel. *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir.1991). Similarly, in a pre-*Davis* decision the Fifth Circuit found that the phrase "I think I want to talk to a lawyer" was an unequivocal request for counsel. *United States v. Perkins*, 608 F.2d 1064, 1066 (5th Cir.1979). On the other hand, two circuits that have considered similar language post-*Davis* found that there was no unequivocal request for counsel. The Second Circuit in *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir.1996) found a suspect's statement "[d]o you think I need a lawyer" was ambiguous within the meaning of *Davis*. The statement in this case is more emphatic than the one considered in *Diaz*, in that it is not in the form of an interrogatory. In *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir.

2000), the Fourth Circuit considered the statement "I think I need a lawyer." The court held that "[t]his statement does not constitute an unequivocal request for counsel. In fact, Burket's statement is quite similar to the defendant's' statement in *Davis* ('Maybe I should talk to a lawyer'), which the Supreme Court found ambiguous." *Id.* at 198. The statement at issue here, if anything, is *more* ambiguous than the one at issue in *Burket*, since Clark stated that he *thought* he would *like* to talk to an attorney.

■ We conclude that the Arizona court's determination that Clark's statement did not constitute an unambiguous and unequivocal request for counsel within the meaning of *Davis* was not contrary to clearly established Federal law, nor was it an objectively unreasonable application of such law. The Arizona court of appeals properly identified the relevant threshold question—whether or not Davis actually invoked his right to counsel thereby triggering *Edwards*—and applied the correct controlling authority. To avoid being "contrary to" Supreme Court precedent, a state court is not required to cite Supreme Court cases or even be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 123 S.Ct. at 365.

■ Nor was the Arizona court's application of the principles enunciated in *Davis* and *Edwards* objectively unreasonable. The very fact that circuit courts have reached differing results on similar facts leads inevitably to the conclusion that the Arizona court's rejection of Clark's claim was not objectively unreasonable. Whether or not we think there is any *constitutional* difference between the statement in *Davis* and the statement at issue here is irrelevant—we express no "independent" opinion on the merits of the

constitutional claim. Under AEDPA, the *only* question we are asked to decide is whether the state court's determination to the contrary was objectively unreasonable and it was surely not. Were we to disagree with the Arizona court's adjudication of the claim, the principles of comity and respect for the Arizona court's status as a co-equal adjudicator of constitutional issues that AEDPA reflects would require us to defer to its reasonable adjudication of the merits of the *Edwards* claim.

In light of the above discussion, it follows that the Arizona court's determination that Clark's subsequent statement "should I be telling you, or should I talk to an attorney?" was not an unambiguous request for counsel was not contrary to or an unreasonable application of clearly established Federal law. In fact, given the Supreme Court's decision in *Davis,* Clark's questions probably did not even rise to the level of an *equivocal* request for an attorney. *See Ogbuehi,* 18 F.3d at 813–14 ("Do I need a lawyer?" or "Do you think I need a lawyer?" not even an equivocal request for a lawyer); *United States v. Jara,* 973 F.2d 746, 750 (9th Cir.1992) (stating that "Should I call my lawyer?" might not even constitute an equivocal request for a lawyer).

### 2

Because we decide that the state court's determination that Clark did not unambiguously invoke his constitutional right to counsel was not objectively unreasonable, we need not reach the issue of whether or not Clark subsequently waived that right.

### C

Next, Clark claims that his confession was involuntary, and that the state court's determination to the contrary was objectively unreasonable. He argues that because he was kept "for over 5 hours in a 6 by 8 foot locked, windowless room with no toilet or water facilities provides ample evidence that the statements given were involuntary." Appellant's Opening Brief, at 29. He further argues that his confession was given because detective Chambers impliedly promised that Clark would receive lenient treatment from the judge and jury. Considering the circumstances in their totality, he argues, his statements were involuntary.

The Fourteenth Amendment to the Constitution requires the suppression of statements obtained by "techniques and methods offensive to due process." *Haynes v. Washington,* 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). To be admissible, a suspect's statement must be voluntary, and in determining whether a statement was voluntary, the question is "whether the defendant's will was overborne at the time he confessed." *Id.* at 513, 83 S.Ct. 1336; *see also Amaya–Ruiz v. Stewart,* 121 F.3d 486, 494 (9th Cir. 1997) (the test is "whether ... the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."). There is no "talismanic definition of 'voluntariness'" that is "mechanically applicable." *Schneckloth v. Bustamonte,* 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Rather, we must assess the totality of all the surrounding circumstances. *Id.* at 226, 93 S.Ct. 2041. Those circumstances include "not only the crucial element of police coercion," but also the length of the interrogation, its location, and its continuity. *Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). They may also include the failure of the police to advise the suspect of his rights, *Haynes,* 373 U.S. at 516–17, 83 S.Ct. 1336, as well as any direct or implied promises of a benefit. *Brady v. United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

■ The Arizona state court, applying the principles enunciated by the Supreme Court in *Schneckloth,* found that the admission into evidence of Clark's statement complied with due process, and that holding was not objectively unreasonable. Clark was detained in an interview room in the Phoenix police station for approximately eight hours. The room itself was unremarkable in its size and nature. *See United States v. D'Antoni,* 856 F.2d 975, 981 (7th Cir.1988) (finding a standard interview room eight feet by twelve feet in size not coercive). So too was the length of the detention, and the intermittent questioning. *See Jenner v. Smith,* 982 F.2d 329, 334 (8th Cir.1993) (six or seven hour questioning not coercive); *Martin v. Wainwright,* 770 F.2d 918, 927 (11th Cir.1985), *modified by* 781 F.2d 185 (1986) (five hour intermittent questioning did not render confession involuntary); *United States v. Lehman,* 468 F.2d 93, 101 (7th Cir.1972) ("vigorous" eight hour questioning with few breaks did not make confession involuntary). Clark himself testified at the pre-trial hearing that he never asked for food or water, or to use the facilities.

■ The conduct of the investigating detectives, for all we can tell from the record, was unimpeachable. Three separate times Clark was read his rights, and all three times Clark responded that he understood those rights. To the extent Clark now argues that his confession was given in reliance on an implied promise of favorable treatment, Detective Chambers made no such promise. Twenty minutes after Clark indicated to the detective that he wanted to continue talking, Clark asked the detective "should I be telling you or should I talk to an attorney?" In response, Detective Chambers, using his hands to illustrate the scales of justice, expressed his *opinion* that a judge and jury would weigh fear of punishment against remorse, and that in his *opinion,* remorse would outweigh the fear of pun-

ishment. Thus, there was no promise, implied or otherwise. *See Amaya–Ruiz,* 121 F.3d at 494 (findings statements "we can forgive your lies, but the United States Court system will not forgive your lies" and "if he wants any forgiveness, he should tell the truth" not coercive). "There is nothing inherently wrong with efforts to create a favorable climate for confession." *Jenner,* 982 F.2d at 334 (quoting *Hawkins v. Lynaugh,* 844 F.2d 1132, 1140 (5th Cir.1988)). "[V]ery few people give incriminating statements in the absence of official action of some kind." *Schneckloth,* 412 U.S. at 224, 93 S.Ct. 2041. In sum, the Arizona court found that the typical indicia of coercion are wholly absent in this record, and its decision is neither contrary to, nor an unreasonable application of Supreme Court precedents.

### III

We conclude that the state court's determination that there was no *Miranda* violation, and that Clark's confession was voluntary, was neither contrary to nor an unreasonable application of clearly established federal law, as determined by the Supreme Court.

The judgment of the district court is hereby AFFIRMED.

STAPLETON, Circuit Judge, concurring:

I agree with my colleagues that the state court's resolution of Clark's claims was neither contrary to, nor an unreasonable application of, clearly established federal law. I reach my conclusions by a somewhat different route, however.

This case is difficult because Clark's statement—"I think I would like to talk to a lawyer"—reflects at least a tentative decision in favor of having a lawyer. It does

not, however, indicate unequivocally that a final decision has been made.

Such a statement presents a more appealing case than did the statement in *Davis*[1]—"Maybe I should talk to a lawyer"—for a rule that the interrogating officer must provide an opportunity for reflection and seek clarification before continuing the substantive interrogation. While the *Davis* Court's interest in drawing a bright-line suggests to me that a majority of the Supreme Court would find no such duty here, a prediction on that score is unnecessary because Clark's interrogator chose to do just that: he provided an opportunity for reflection and sought clarification. Even if this case be viewed as distinguishable from *Davis*, nothing in the Supreme Court case law suggests to me that the interrogator's conduct here constitutes a violation of the Fifth or Fourteenth Amendment. To the contrary, the Court in *Davis*, while refusing to impose a duty to clarify in the circumstances there presented, recognized the utility of seeking clarification when uncertainty exists about the counsel issue:

> Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case. Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule

requiring officers to ask clarifying questions.

*Davis,* 512 U.S. at 461, 114 S.Ct. 2350.

I would affirm the judgment of the district court.

1. *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).