**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TIO DINERO SESSOMS,
  *Petitioner-Appellant,*

v.

D. L. RUNNELS,
  *Respondent-Appellee.*

No. 08-17790

D.C. No.
2:05-cv-01221-
JAM-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted
September 1, 2010—San Francisco, California

Filed June 3, 2011

Before: Betty B. Fletcher, Richard C. Tallman, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge B. Fletcher

**COUNSEL**

Eric Weaver (argued), Albany, California, for petitioner-appellant Tio Dinero Sessoms.

Edmund G. Brown, Attorney General of California, Michael P. Farrell, Senior Assistant Attorney General, Charles A. French, Supervising Deputy Attorney General, Jeffrey D. Firestone (argued), Deputy Attorney General, Sacramento, California, for respondent-appellee D. L. Runnels.

# OPINION

TALLMAN, Circuit Judge:

Petitioner-Appellant Tio Dinero Sessoms, a California prisoner, appeals the district court's denial of his habeas corpus petition challenging his California felony murder conviction. He argues predominately that he unequivocally asserted his right to counsel when he asked Sacramento homicide detectives whether he had a right to an attorney and subsequently told those detectives that his father had asked him to inquire about an attorney. He also argues that even if his requests were ambiguous the detectives had an obligation to ask him clarifying questions prior to continuing with their interrogation. Finally, he argues that the detectives violated his right to remain silent when they interviewed him without objection five days after he invoked his right to remain silent to different officers from a different police department after he was arrested. He contends that he is entitled to federal habeas relief because any of these claimed violations required the California state courts to suppress the incriminating statement he made after he expressly waived his *Miranda* rights.

Mindful that we must review this petition through the deferential lens of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, we disagree. Though some of Sessoms's claims admittedly raise a close question as to how we may have ruled were we reviewing his conviction without AEDPA deference, we cannot conclude that the decisions of the California state courts[1] were "contrary to, or an unreasonable application of," established

---

[1]The parties agree that the decision of the California Court of Appeal on January 12, 2004, was the last reasoned decision in regard to Sessoms's first two claims. Because the state courts denied Sessoms's third claim without formal opinion or comment, we review that claim independently under AEDPA. *See Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000) (independently reviewing the record to determine whether a state court's unexplained decision fell within the bounds of AEDPA).

United States Supreme Court precedent—the showing AEDPA requires to permit relief. § 2254(d)(1). Because Sessoms cannot "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011), we affirm the district court's denial of habeas relief.

**I**

On October 20, 1999, Sessoms and two other men entered the Sacramento, California, residence of Edward Sherriff to commit a burglary. During the burglary, Sherriff was choked and stabbed to death by one of Sessoms's accomplices. The men then fled the scene, taking cash, jewelry, and Sherriff's two vehicles with them.

Shortly thereafter, Sessoms traveled to Langston, Oklahoma, where, at the urging of his father, he surrendered to local police on November 15, 1999. Upon arrest, Langston police officers read Sessoms his *Miranda* rights and asked whether he wanted to "make a statement." He declined. The Langston police did not press Sessoms any further and transported him to a jail in Oklahoma City to await extradition to California.

Five days later, on November 20, 1999, two Sacramento city homicide detectives, Dick Woods and Pat Keller, arrived in Oklahoma City to question and extradite Sessoms. Sessoms was brought to an interview room where he waited to meet with the detectives for the first time. He was not aware that everything in the room was being video recorded. When the detectives entered the room, Sessoms was pleasant and polite. He told the detectives that he was glad they had arrived safely. The detectives were likewise pleasant and polite. Detective Woods joked that he hoped the return flight would be just as good.

Woods then introduced himself and Detective Keller. When Woods paused to read his notes, Sessoms made the first of the two statements at issue, asking Woods whether he had the right to have an attorney present during the interview. Specifically, he asked, "There wouldn't be any possible way that I could have a — a lawyer present while we do this?" He then explained to the detectives that his father was concerned that some officers might attempt to switch his words around after the fact and that his father had therefore "asked me to ask you guys — uh, get me a lawyer." The detectives responded by telling Sessoms that they could record the interview to allay those concerns. Sessoms agreed. More importantly, though, after setting up a recording device on the table, Woods directly addressed Sessoms's question regarding whether he had a right to counsel. He told Sessoms that he did have the right to have counsel present during the interview, but— demonstrating his understanding as to what Sessoms was asking—emphasized that Sessoms would need to decide whether he wanted to claim that right.[2]

---

[2]The black and white record stands in stark contrast to the dissent's attempts to color the detectives as tricksters bent on subverting at every turn the polite overtures of Sessoms, who our colleague paints as "a naive and relatively uneducated 19-year-old boy." *Dissent* at 7369. Contrary to the dissent's convenient conclusion that the detectives understood Sessoms's statements to be an invocation of the right to counsel, at 7369-70, the record demonstrates the very opposite: immediately after Sessoms made his statements—and without the benefit of intervening years to craft a post hoc reconstruction—Detective Woods honestly answered Sessoms's question, telling him that he did in fact have the right to an attorney but "it's up — for you to decide if you want the attorney or not." *Cf. United States v. Pheaster*, 544 F.2d 353, 368 (9th Cir. 1976) ("It is also important to note that Pheaster's statements came as a result of an objective, undistorted presentation of the extensive evidence against him, particularly the positive identification of his fingerprint on the ninth note. . . . [T]he questioning did not really begin until Pheaster had clearly indicated his willingness to cooperate."). The dissent's statement that "[Detective Woods] reassured Sessoms that counsel was unnecessary," *Dissent* at 7369, also finds no support in the actual videotaped record, which fully captured Woods's conversation with Sessoms.

Uh, I want to back up to your question you asked about an attorney. Um, first, before you ask questions, uh, I'm going to tell you why we're here, just lay it out and be up-front. And then — then I'm going to advise you of your rights. And then it's up — for you to decide if you want the attorney or not.

Thereafter, the detectives explained to Sessoms what information they had and what the other two suspects had told them. Notably, Woods told Sessoms that he was surprised by the fact that neither of the other suspects had chosen to invoke their rights. He told Sessoms that they would not take his statement without an attorney if Sessoms wanted an attorney and added that "all attorneys . . . will sometimes or usually advise you not to make a statement."[3] He also reiterated to Sessoms that it was Sessoms's choice whether he wanted counsel or not:

I'm not trying to take any rights away from you or anything else. What I want to do, Tio, is advise you of your rights, make sure you understand them. Then you make the decision if you want to talk to us or not. — It's not for me to make, not for [Detective Keller] to make; it's — it's for you to make. Um, have you ever been advised of your rights before?

Detective Woods then read Sessoms his *Miranda* rights verbatim from a form, while Sessoms read along silently from

---

[3]Notwithstanding the recording of what Woods actually said, the dissent argues that Woods was in fact telling Sessoms that a lawyer would only hurt his interests and that "it was in his best interest not to obtain counsel." *Dissent* at 7370. Because it relies on that insinuation, it is therefore unsurprising that the dissent fails to even acknowledge, let alone address, the fact that Woods told Sessoms no less than three times in the span of a few minutes that Sessoms had a right to counsel and that, before the detectives would speak to Sessoms further, he had to choose whether to claim that right or waive it.

an additional copy of the text.[4] Woods asked Sessoms if he understood each distinct right. Sessoms stated that he did. Woods then asked, "Okay. Having these rights in mind, do you wish to talk to us now?" Sessoms shrugged. "That's solely up to you," Woods added. After pausing to think, Sessoms replied simply, "Let's talk." He then fully confessed to his involvement in the crime.

Prior to his trial, Sessoms sought to have his confession suppressed, claiming he had "clearly and unequivocally requested the assistance of an attorney." The Sacramento County Superior Court conducted an evidentiary hearing, heard argument, and watched the videotape of the interview. It concluded that Sessoms's initial statement was not an assertion of his rights but a question as to whether he even had such a right. The court noted that following Sessoms's question, the officers did not ask about the incident until after Sessoms had received his complete *Miranda* warnings and had waived his constitutional rights.

---

[4]In light of this undisputable record fact, the dissent's attempt, *Dissent* at 7368-69, 7373 n.5, to engraft *Doody v. Ryan*, ___ F.3d ___, 2011 WL 1663551 (9th Cir. May 4, 2011), into its reasoning is puzzling. How Detective Woods's actions in any way conflict with Chief Judge Kozinski's admonition in *Doody* that "[i]t's not too much to ask that police recite [*Miranda* warnings] as prescribed by the Supreme Court, and not augment them in a way that will obscure their meaning and undermine their effect," *Dissent* at 7373 n.5. (quoting *Doody*, 2011 WL 1663551, at *39 (Kozinski, J., concurring)), is not evident and plainly demonstrates why the dissent stands completely alone—not even joined by Sessoms—in its position. Simply put, the detectives did not "take a butcher knife to *Miranda*." *Id*. at 7369. Rather, they provided Sessoms his *Miranda* rights *prior to any questioning*, just as our precedent requires. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010) ("A suspect in custody must be . . . 'warned *prior to any questioning* that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " (quoting *Miranda*, 384 U.S. at 479 (emphasis added))); *Pheaster*, 544 F.2d at 368.

Eventually, a Sacramento County Superior Court jury found Sessoms guilty of first degree murder,[5] robbery, and burglary. Prior to sentencing, Sessoms moved for a new trial, alleging the trial court had erred in failing to suppress his statement. The court again heard arguments and spent hours reviewing the videotape and transcript before concluding that Sessoms's initial statement was a question, not a "direct unequivocal request to be provided with an attorney on the spot." After denying the motion, the Superior Court sentenced Sessoms to life in prison without the possibility of parole.

Sessoms appealed his conviction to the California Court of Appeal, claiming that the trial court erred by failing to suppress his confession in light of his request for counsel. The Court of Appeal affirmed the trial court, finding that neither of Sessoms's statements were sufficiently clear that a reasonable police officer in the circumstances would have understood the statement to be a request for counsel. *People v. Sessoms*, No. C041139, 2004 WL 49720, at *3 (Cal. Ct. App. Jan. 12, 2004) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994), *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), and *Miranda v. Arizona*, 384 U.S. 436, 474 (1966)). Sessoms then filed multiple state habeas petitions, claiming he had been deprived of the effective assistance of counsel. Each was denied. He then filed the instant federal habeas petition, which the district court denied. Following the district court's issuance of a certificate of appealability for his claims, Sessoms timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we now affirm.

## II

We review de novo a district court's denial of a state prisoner's petition for a writ of habeas corpus. *Murdoch v. Cas-*

---

[5]The jury found that Sessoms acted as a major participant in the robbery and burglary that resulted in Sherriff's death and thus found him guilty under a felony murder theory. *See* Cal. Penal Code § 190.2(a), (d).

*tro*, 609 F.3d 983, 989 (9th Cir. 2010) (en banc). Like the district court, however, we recognize that because Sessoms's petition for habeas corpus was filed after the enactment of AEDPA, our review is limited by 28 U.S.C. § 2254(d), which applies to each of Sessoms's claims. *See Anderson v. Terhune*, 516 F.3d 781, 786-87 (9th Cir. 2008) (en banc) (analyzing pursuant to § 2254(d) the state court's determination that the defendant did not unequivocally invoke his right to remain silent); *Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) (applying § 2254(d) to accused's claim that he was denied effective assistance of counsel).

Section 2254(d) provides that an application for a writ of habeas corpus shall not be granted based on a claim adjudicated on the merits in state court unless the adjudication either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The Supreme Court has explained that clearly established Federal law "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant statecourt decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Additionally, the Court has emphasized that the "contrary to" and "unreasonable application" clauses have distinct meanings. *Williams*, 529 U.S. at 405. A "state-court decision can be 'contrary to' th[e] Court's clearly established precedent . . . if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law." *Id*. A state-court decision would also be contrary to the "Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [that] precedent." *Id*. at 406.

In regard to the "unreasonable application" prong, the Court specified that "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.' "[6] *Id.* at 407-08 (alteration in original). The Court has cautioned, however, that the " 'unreasonable application' clause requires the state-court decision to be more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75 (rejecting the Ninth Circuit's application of the clear error standard); *Williams*, 529 U.S. at 410.

> It is not enough that a federal habeas court, in its "independent review of the legal question," is left with a " 'firm conviction' " that the state court was " 'erroneous.' " We have held precisely the opposite: "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Rather, that application must be objectively unreasonable.

*Lockyer*, 538 U.S. at 75-76 (citations omitted); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (per curiam);

---

[6]The Court also stated that a state court decision could be unreasonable "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. However, the Court declined "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," *id.* at 408-09, and has since made clear that the absence of controlling Supreme Court precedent effectively insulates a state court decision from federal review under AEDPA, *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in [the accused's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law." (citation and internal quotation marks omitted)).

*Bell v. Cone*, 535 U.S. 685, 698-99 (2002). And, most recently in *Richter*, the Court took great pains to fully underscore the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.* Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

131 S. Ct. at 786-87 (emphasis added); *see also Lockyer*, 538 U.S. at 75-76.

**III**

Having ascertained the standards by which we must review the last reasoned decision of the state courts, *see Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), we turn to the merits of Sessoms's three habeas claims. Because we conclude that none of the state courts' decisions rose to the level required by AEDPA to overturn them, we deny his claims for federal habeas relief.

## A

We first consider whether the determination of the California Court of Appeal that Sessoms did not unequivocally invoke his right to counsel "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

**[1]** The question is a crucial one. If an accused invokes his right to have counsel present during a custodial interrogation, he may not be subjected to further questioning by the authorities until a lawyer has been made available "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. This rigid prophylactic rule comes with a caveat, however. Before it applies, a court "must determine whether the accused actually invoked his right to counsel." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam) (citing *Edwards*, 451 U.S. at 484-85, and *Miranda*, 384 U.S. at 444-45); *see also Davis*, 512 U.S. at 459 ("Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." (internal citations omitted) (quoting and citing *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) ("[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*." (emphasis in original)))).[7]

---

[7]Because our opinion rests on the firm jurisprudential ground that only an unequivocal invocation will do—a settled principle the Supreme Court has reiterated time-and-time again—we are at a loss to understand what "magic words" test troubles the dissent. *Compare Smith*, 469 U.S. at 95-96 (concluding that *ambiguous or equivocal* statements do not suffice),

The California Court of Appeal determined that Sessoms's statements fell within the caveat—not the rule. Sessoms believes otherwise. He argues that his statements raise a "close question" as to whether he legally invoked his right to counsel and that the state court erred in resolving that question against him. On that basis, he asks us to grant him habeas relief. To resolve whether we should accept his invitation, we first, as a necessary prerequisite, identify the "clearly established Federal law" governing his claim. We then examine whether the decision of the California Court of Appeal was "contrary to, or involved an unreasonable interpretation of," that Supreme Court precedent or "was based on an unreasonable determination of the facts." Ultimately, in light of the eminently "difficult" bar posed by AEDPA, we cannot conclude that it was. *E.g.*, *Richter*, 131 S. Ct. at 786-87; *Yarborough v. Alvarado*, 541 U.S. 652, 663-66 (2004) (concluding AEDPA precluded relief because arguments existed to support the state court's conclusion). We therefore decline to grant Sessoms habeas relief.

## 1

**[2]** In the case at hand, neither party challenges the state court's reliance on specific language from *Davis* to fix the appropriate legal standard by which to measure the equivocality of Sessoms's statement:[8]

---

*and Edwards*, 451 U.S. at 486 (same), *with Dissent* at 7371. Rather than presenting a problem of "wands" and "disappearing acts," *cf. Dissent* at 7381, we think our disagreement results solely from a less enchanting reality: the dissent's failure to acknowledge that the Court in *Davis* did not end its discussion of *Miranda* after its "at a minimum" statement but, as demonstrated, went on to describe that it has *always required* an unambiguous or unequivocal statement. *Davis*, 512 U.S. at 459.

[8]To determine the need for an unequivocal statement, the state court turned to Supreme Court precedent, applying *Davis*, 512 U.S. at 459-62, *Edwards*, 451 U.S. at 484-87, and *Miranda*, 384 U.S. at 474. *Sessoms*, 2004 WL 49720, at *2-3.

> Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Sessoms*, 2004 WL 49720, at *3 (quoting *Davis*, 512 U.S. at 459 (citation omitted)). We recognize, however, that *Davis*'s reach was explicitly limited by the Court to statements made *post-waiver*. *Davis*, 512 U.S. at 460-61; *accord United States v. Rodriguez*, 518 F.3d 1072, 1080 (9th Cir. 2008) (limiting application of *Davis* to equivocal statements made post-waiver). Because Sessoms's statements were made *prior* to his *Miranda* waiver, *Davis* cannot apply as "clearly established Federal law" in this case.

Of course, our conclusion that *Davis* cannot serve as "clearly established Federal law" does not *ipso facto* entitle Sessoms to relief. *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court . . . it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (alterations in original)); *see also DeWeaver v. Runnels*, 556 F.3d 995, 1002 (9th Cir. 2009) ("We . . . could not conclude that application of the *Davis* rule to an invocation of the right to remain silent is contrary to or an unreasonable application of Supreme Court precedent where the Supreme Court has neither 'squarely addresse[d]' when an ambiguous statement amounts to an invocation of the right to remain silent nor refused to extend the *Davis* rule to an invocation of the right to remain silent." (second alteration in original) (citing *Van Patten*, 552 U.S. at 124-25)). To the contrary, our system of justice *depends* on the ability of state courts to serve as "laboratories for testing solutions to novel legal problems." *Smith v. Robbins*, 528 U.S. 259, 275 (2000) (AEDPA case) (citation omitted).

> In short, it is more in keeping with our status as a
> court, and particularly with our status as a court in
> a federal system, to avoid imposing a single solution
> on the States from the top down. We should, and do,
> evaluate [S]tate procedures one at a time, as they
> come before us, while leaving 'the more challenging
> task of crafting appropriate procedures . . . to the lab-
> oratory of the States in the first instance.' We will
> not cavalierly 'imped[e] the States' ability to serve
> as laboratories for testing solutions to novel legal
> problems.'

*Id*. (internal citations omitted). As the Supreme Court has
never held against application of the *Davis* standard to a situa-
tion like Sessoms's, the state court's application of that stan-
dard cannot violate the bounds of either the "contrary to" or
"unreasonable application" inquiries. *See id.*; *Schriro v. Lan-
drigan*, 550 U.S. 465, 478 (2007) (concluding that a state
court's decision was not objectively unreasonable because the
Supreme Court had yet to speak on the issue). Simply put, one
cannot demonstrate that a decision is "contrary to, or an
unreasonable application of," precedent that does not yet
exist.

Moreover, without *Davis*, we are unable to find any
Supreme Court precedent where the Court provided a legal
test for distinguishing equivocal from unequivocal pre-waiver
statements or even directly addressed the effect of an ambigu-
ous pre-waiver statement—a reality that is not surprising
given that pre-waiver statements are usually inadmissible and
individuals who desire counsel do not normally thereafter
waive their *Miranda* right to counsel. *See Davis*, 512 U.S. at
460-61 ("We recognize that requiring a clear assertion of the
right to counsel might disadvantage some suspects who—
because of fear, intimidation, lack of linguistic skills, or a
variety of other reasons—will not clearly articulate their right
to counsel although they actually want to have a lawyer pres-
ent. *But the primary protection afforded suspects subject to*

*custodial interrogation is the Miranda warnings themselves* . . . . A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." (emphasis added)). *But cf. Dissent* at 7381 (arguing that the Court's invocation standard "is not a rigorous one" and that our reliance on *Edwards* creates a "particular injustice" for the poor and less educated).

**[3]** Sessoms's claim therefore hinges upon our determination that the decision of the California Court of Appeal was "contrary to, or an unreasonable application of," the general *Edwards* standard that an accused must have "actually invoked his right to counsel." *Smith*, 469 U.S. at 95; *see also Edwards*, 451 U.S. at 485. "[A]s th[e] Court has explained," this only makes Sessoms's task that much more difficult: " '[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. *The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations*.' " *Richter*, 131 S. Ct. at 786 (second alteration in original) (emphasis added) (quoting *Yarborough*, 541 U.S. at 664).

**2**

Having identified the general *Edwards* "equivocality" standard as our North Star of "clearly established Federal law," we now review the state court's course against the compass of AEDPA.

We first consider whether the state court arrived at a conclusion opposite to that reached by the Court on a question of law. *See Williams*, 529 U.S. at 405; *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (noting that a state-court decision is not contrary to Supreme Court precedent for failure to cite that precedent "so long as neither the reasoning nor the result of the state-court decision contradicts [it]"). We hold that it did not.

**[4]** Quite appropriately, the state court concluded that an unequivocal invocation was required. *Compare Sessoms*, 2004 WL 49720, at *2, *with Smith*, 469 U.S. at 95-97 ("This case concerns the threshold inquiry: whether Smith invoked his right to counsel in the first instance. On occasion, an accused's asserted request for counsel may be *ambiguous or equivocal*. . . . [But n]either the State nor the courts below, for example, have pointed to anything Smith previously had said that might have cast doubt on the meaning of his statement 'I'd like to do that' upon learning that he had the right to his counsel's presence. Nor have they pointed to anything *inherent in the nature of Smith's actual request for counsel that reasonably would have suggested equivocation*." (emphasis added)), *id.* at 98 ("Where nothing about the request for counsel or the circumstances leading up to the request would render it *ambiguous*, all questioning must cease." (emphasis added)), *and Edwards*, 451 U.S. at 485 ("[I]t is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel." (emphasis added)).

**[5]** In addition, the state court did not confront a set of facts materially indistinguishable from a decision of the Court and nevertheless arrive at a different result. *Williams*, 529 U.S. at 405. Logically, a legal determination as to whether an attempted invocation was equivocal or not is plainly driven by the particular facts of a case. *See Robinson v. Borg*, 918 F.2d 1387, 1390 (9th Cir. 1990). Sessoms has not provided, and we cannot find, any example in Supreme Court precedent where an individual uttered a materially indistinguishable statement and the Court concluded that he or she had unequivocally invoked his or her right to counsel.[9] *Cf. Sessoms*, 2004 WL

---

[9]The fact that only Supreme Court precedent binds state courts under AEDPA also disposes of the dissent's suggestion that *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999), binds our reasoning. *Richter*, 131 S. Ct. at 786; *Lockyer*, 538 U.S. at 71. At best, circuit precedent may serve as persuasive authority. *Clark v. Murphy*, 331 F.3d 1062, 1071 (9th Cir.

49720, at *3 (concluding that Sessoms's statements were "legally indistinguishable" from the statement in *Davis*[10] that the Supreme Court found ambiguous). Instead, the state court's decision appears, at worst, to fall directly within that class of cases that the Supreme Court specifically excepted from running afoul of the "contrary to" inquiry:

On the other hand, a run-of-the-mill state-court

---

2003). *But see Cullen v. Pinholster*, 131 S. Ct. 1388, 1411 (2011) ("Those cases [decided without regard for AEDPA] therefore offer no guidance with respect to whether a state court has unreasonably determined that prejudice is lacking."). However, the persuasive merit of any particular case can only be determined through comparison to the entire body of circuit case law—both ours and that of our sister circuits. *Kessee v. Mendoza-Powers*, 574 F.3d 675, 677 (9th Cir. 2009) ("For purposes of AEDPA review, however, a state court's determination that is consistent with many sister circuits' interpretations of Supreme Court precedent, even if inconsistent with our own view, is unlikely to be 'contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.' "); *Clark*, 331 F.3d at 1071 ("The very fact that circuit courts have reached differing results on similar facts leads inevitably to the conclusion that the Arizona court's rejection of Clark's claim was not objectively unreasonable."). As a quick of review of just our own precedent demonstrates a disparity of outcomes under similar facts, *Alvarez* does not aid our inquiry as to AEDPA unreasonableness. *Kessee*, 574 F.3d at 677; *compare Alvarez*, 185 F.3d at 998, *with United States v. Younger*, 398 F.3d 1179, 1184, 1187-88 (9th Cir. 2005) (concluding that the defendant's pre-Miranda statement, "But, excuse me, if I am right, I can have a lawyer present through all this, right?," was not an unambiguous request for counsel), *and Clark*, 331 F.3d at 1065, 1071-72 (concluding that neither the statement, "I think I would like to talk to a lawyer," nor "should I be telling you or should I talk to a lawyer?," constituted an unequivocal request for counsel).

[10]In *Davis*, the petitioner stated, "Maybe I should talk to a lawyer." 512 U.S. at 455. Like the Sacramento detectives here, the interviewing agents in *Davis* were unsure if Davis was asking for a lawyer or merely making a comment about a lawyer. *Id.* The agents told Davis that they did not want to violate his rights, so if he was asking for a lawyer, they would stop questioning him and get him a lawyer. *Id.* The Sacramento detectives did exactly the same with Sessoms, and, like Davis, Sessoms chose to talk.

decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. *Although the state-court decision may be contrary to the federal court's conception of how* Strickland *ought to be applied in that particular case, the decision is not "mutually opposed" to* Strickland *itself.*

*Williams*, 529 U.S. at 406 (emphasis added).

**[6]** We next consider whether the state court's decision unreasonably applied Supreme Court precedent. The conclusion of the California Court of Appeal was that "although defendant twice explicitly referred to an attorney, neither statement was an unequivocal or unambiguous request for counsel." *Sessoms*, 2004 WL 49720, at *3. It considered Sessoms's first statement to be merely a question regarding whether he was entitled to a lawyer—if he desired one. *Id.* (comparing Sessoms's statement to those of the defendant in *Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer"), and *People v. Crittenden*, 885 P.2d 887, 908 (Cal. Ct. App. 1994) ("Did you say I could have a lawyer?"), which were held ambiguous). It found his second statement even less suf-

ficient, considering it merely "a statement of [Sessoms's] father's advice to him." *Id.*

**[7]** Upon first impression, these determinations may seem harsh—a bare reading of the black-and-white transcript does raise a close question as to whether Sessoms legally invoked his right to counsel. *But see Yarborough*, 541 U.S. at 664-65. However, we recognize that, under AEDPA, we cannot simply "treat[ ] the unreasonableness question as a test of [our] confidence in the result [we] would reach under de novo review" or even a question of whether we have "little doubt" that Sessoms has a valid claim. *Richter*, 131 S. Ct. at 786; *Woodford*, 537 U.S. at 24-25 ("An 'unreasonable application of federal law is different from an incorrect application of federal law.' " (quoting *Williams*, 529 U.S. at 410)). Rather, under AEDPA, we may only grant relief if we determine "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87; *see Lockyer*, 538 U.S. at 75-76. In making that inquiry, we are bound to give due regard for the specificity of the relevant standard set by the Court, *Yarborough*, 541 U.S. at 664, and cannot overlook arguments that would otherwise justify the state court's result, *Richter*, 131 S. Ct. at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."); *Yarborough*, 541 U.S. at 664-65 (detailing the facts supporting the state court's decision and concluding that these "differing indications" demonstrated "that the state court's application of [the Court's] custody standard was reasonable" because "it can be said that fairminded jurists could disagree over whether [the petitioner] was in custody"). Under this eminently "difficult" standard,[11]

---

[11]We fully agree with our dissenting colleague that "AEDPA's 'standard is demanding but not insatiable' and 'deference does not by defini-

*Richter*, 131 S. Ct. at 786, Sessoms simply cannot demon-
strate the requisite AEDPA unreasonableness—especially
when the conversation between Sessoms and the detectives is
colored with tone, inflection, body language, and the infinite
other minute qualities of demeanor and affect that cannot be
ascertained from words alone, but are plainly apparent on the
videotape evidence of what transpired.

**[8]** When Sessoms asks if he is entitled to an attorney, his
inflection, body language, and manner support the state
court's conclusion that he was completely unaware if he even
had a right to counsel under the circumstances and was only
asking if he *could* request counsel. Sessoms's second state-
ment is even further from the mark. While he makes clear to
the detectives that his father had advised him to ask for coun-
sel, he never indicates any desire to transform his father's
advice into his own desire to have a lawyer present. Even
taken cumulatively, the statements could reasonably be inter-
preted to convey a question followed by an expression of Ses-
soms's father's advice to him—statements that do not
evidence an unequivocal desire for counsel. *Cf. Yarborough*,
541 U.S. at 664-66 (analyzing whether any facts supported
the state court's decision). Moreover, at no other point did
Sessoms, once informed he could, indicate that he wanted to

tion preclude relief.' " *Dissent* at 7368-69 (some internal quotations
omitted) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). Where
we differ is in *our* recognition that the Court has, since *Miller-El*, taken
great care to fully articulate the requirements necessary to satisfy AEDPA.
*E.g.*, *Richter*, 131 S. Ct. at 785-86 ("As amended by AEDPA, § 2254(d)
stops short of imposing a complete bar on federal court relitigation of
claims already rejected in state proceedings."); *Yarborough*, 541 U.S. at
660-66. Simply put, whereas the dissent relies on the Court's broad
strokes, we apply its specific examples. *Cf. United States v. Brewster*, 408
U.S. 501, 516 (1972) ("Appellee's contention for a broader interpretation
of the privilege draws essentially on the flavor of the rhetoric and the
sweep of the language used by courts, not on the precise words used in
any prior case, and surely not on the sense of those cases, fairly read.").

claim his right to counsel.**¹²** Rather, Sessoms ignored Woods's hints—that Woods was surprised that none of Sessoms's accomplices had asked for an attorney and that most attorneys would tell a suspect to invoke his or her rights—and *Miranda*'s protections. He waived his rights and elected to speak to the detectives.

**[9]** Upon this record, we have to agree with the district court that the state court's decision cannot be characterized as objectively unreasonable. As we stated previously, any number of "fairminded" jurists may have answered the question differently had it come before them outside the confines of AEDPA review. Certainly, this issue, stripped of its habeas posture, raises a "close question" under the general *Edwards* standard. However, unlike Sessoms and our dissenting colleague,**¹³** we recognize that AEDPA requires more: "an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement.*" *Richter*, 131 S. Ct. at 786-87 (emphasis added) ("A state court's determination that a claim lacks merit precludes federal habeas relief

---

**¹²**We are cognizant of the Supreme Court's holding in *Smith*, 469 U.S. at 100, and reach our conclusions regarding Sessoms's two statements based solely on the clarity of the statements themselves. We emphasize only that Sessoms never made any additional comments referencing counsel after the detectives began recording the interview.

**¹³**We respectfully reject our dissenting colleague's accusation that we only "pay lip service" to the Court's directives. Unlike the dissent, we do not "overlook[ ] arguments that would otherwise justify the state court's result . . . ." *Richter*, 131 S. Ct. at 786; *Yarborough*, 541 U.S. at 664-66. *But see Dissent* at 7373-80 (failing to even consider arguments that support the California court's decision). We do not evaluate the state's result under standards set by courts other than the Supreme Court. *Richter*, 131 S. Ct. at 786; *see Pinholster*, 131 S. Ct. at 1411. *But see Dissent* 7375-76 n.6; *id.* at 7380 n.10. And, we do not forget that the *Edwards* standard is a general one. *Compare Yarborough*, 541 U.S. at 664 ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."), *with Edwards*, 451 U.S. at 484-85. *But see Dissent* at 7371-72.

so long as 'fairminded jurists could disagree' on the correct-
ness of the state court's decision." (citing *Yarborough*, 541
U.S. at 664)). Here, that standard has not been met. Fair-
minded arguments exist *to support* the state court's
determination—a conclusion evidenced by the fact that Ses-
soms himself labels the question "a close one." *Cf. Yarbor-
ough*, 541 U.S. at 664-66. The state court's conclusion is thus
secure behind the broad shield of AEDPA deference. *Id.*; *see
also* § 2254(d).

As neither party disputes the state court's factual determi-
nation as to what was said during the interview, we have no
cause to address § 2254(d)(2). *See Borg*, 918 F.2d at 1390
("Whether the suspect's words constitute a request for counsel
is a legal determination . . . ." ) (citing *Smith v. Endell*, 860
F.2d 1528, 1532 n.3 (9th Cir. 1988) ("[T]he state court's char-
acterization of Smith's words is hardly a finding of fact. . . .
The constitutional effect of the dialogue is a legal question
. . . .")).

**[10]** Because none of the § 2254(d) standards are met, we
cannot grant Sessoms federal habeas relief on this claim.

## B

**[11]** Sessoms next argues that even if his statements were
ambiguous, the Sacramento detectives were limited to asking
clarifying questions prior to continuing with their interroga-
tion.[14]

This claim is dependent upon two assertions. First, it
requires that *Davis* be held inapplicable to this pre-waiver
context. Second, it depends on our agreement that the state

---

[14]Because we conclude that the police were not under an obligation to
ask clarifying questions, we do not consider whether the subsequent fur-
nishment to Sessoms of his *Miranda* warnings and his express waiver sat-
isfy *Rodriguez*.

court was bound by our conclusion in *Rodriguez* that, as Sessoms asserts, police are "limited to questions seeking to clarify the defendant's intent" when confronted with ambiguous requests for counsel made *prior* to the administration of *Miranda* warnings and a defendant's waiver of those rights. Because we find no basis under AEDPA for requiring state courts to adhere to precedent not established by the Supreme Court, we cannot agree.

Plainly, if *Davis* applies to the record before us, Sessoms's claim fails.[15] So, Sessoms reverses course, arguing that *Davis* is inapplicable in this pre-waiver context. For the reasons already discussed, we agree. *Davis*, 512 U.S. at 460-61; *accord Rodriguez*, 518 F.3d at 1080. Contrary to Sessoms's assertions, however, the absence of *Davis* does not change the outcome.

[12] Sessoms makes no attempt to clothe his argument under the guise of Supreme Court authority. Rather, he cites only our holding in *Rodriguez* to support his claim. *Rodriguez* itself makes clear, though, that its holding is based solely on Ninth Circuit precedent. *Id.* ("To the extent *Nelson* [v. *McCarthy*, 637 F.2d 1291, 1296-97 (9th Cir. 1980),] requires pre-waiver clarification of a suspect's wishes concerning his *Miranda* rights, it has not been superseded by *Davis* and remains binding precedent."). Because state courts are not bound under AEDPA by precedent other than that established by the Supreme Court, *Rodriguez* is immaterial to our review of the state court's decision to the extent Sessoms relies on it to argue that clarifying questions were required.[16] *Compare*

---

[15]Under the circumstances present in *Davis*, the Supreme Court clearly rejected the proposition that police are required to ask clarifying questions when a suspect makes an ambiguous statement. 512 U.S. at 462 ("[W]e are unwilling *to create* a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer." (first emphasis added)).

[16]Our dissenting colleague seizes upon our use of the word "immaterial" to argue that we do not recognize *Rodriguez*'s persuasive value. *Cf. Dis-*

*Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006) (holding that where the Supreme Court has expressly left an "open question," circuit precedent is immaterial and there is no clearly established law for the state court to have unreasonably applied), *with Davis*, 512 U.S. at 461 (holding that an objectively ambiguous request, made post waiver, does not require police to ask clarifying questions), *and Smith*, 469 U.S. at 96 (reserving as an open question the issue of the effect of an ambiguous statement *preceding* invocation or an ambiguous request *itself*).

**[13]** As we find ourselves without any basis in "clearly established Federal law" for Sessoms's claim, we again decline to grant Sessoms relief. *See Knowles*, 129 S. Ct. at 1419; *Van Patten*, 552 U.S. at 126.

## C

**[14]** Sessoms's final claim is that his trial counsel performed ineffectively by choosing not to pursue a motion to suppress Sessoms's admission on the grounds that detectives Woods and Keller[17] failed to "scrupulously honor" his

---

*sent* at 7380 n.10. We believe our colleague misunderstands us. *Rodriguez* is only "immaterial" to the extent Sessoms relies on it to contend that the Sacramento detectives were required to ask him clarifying questions. *Rodriguez*, 518 F.3d at 1080 (noting that the requirement is founded in circuit precedent, not Court precedent); *see, e.g.*, *Pinholster*, 131 S. Ct. at 1411; *Richter*, 131 S. Ct. at 786-87; *Lockyer*, 538 U.S. at 75-76. To the extent *Rodriguez* might otherwise persuade us of the limited applicability of *Davis*'s standard for measuring equivocality, it suffers from the same shortcomings previously described *supra* at note 9. *Cf. DeWeaver*, 556 F.3d at 1002; *Anderson*, 516 F.3d at 787 n.3 (en banc) ("We acknowledge that *Davis* is an invocation of counsel case under *Miranda*, not a Fifth Amendment right to silence case . . . . Nonetheless, the general principles from cases involving the clarity of invocation of rights during custodial interrogation are instructive as to common sense interpretation of language.").

[17]Sessoms does not allege any impropriety on the part of the Langston Police Department.

November 15 invocation of his right to remain silent when they interviewed him on November 20.[18] *See Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975).

In ordinary cases, a defendant bears the burden of convincing the reviewing court that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by such deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, as this claim comes before us under AEDPA review, Sessoms faces the additional hurdle of § 2254(d). *Pinholster*, 131 S. Ct. at 1411; *Richter*, 131 S. Ct. at 788; *Premo v. Moore*, 131 S. Ct. 733, 739-41 (2011); *Earp*, 431 F.3d at 1185; *see also Delgado*, 223 F.3d at 981-82. Because we find no basis in the record from which to conclude that a *Mosley* motion could have succeeded, we conclude that Sessoms's trial counsel did not perform ineffectively in choosing not to pursue it. We therefore do not consider Sessoms's claims regarding prejudice, as we agree with the district court that § 2254(d) does not permit issuance of the federal writ.

**[15]** In *Mosley*, the Supreme Court concluded that the "admissibility of statements obtained after the person in custody has decided to remain silent" depends on whether that person's "right to cut off questioning" was "scrupulously honored." 423 U.S. at 104. The Court explained that this critical "right to cut off questioning" is met when the person in custody "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103-04. The Court thereafter distinguished the second inter-

---

[18]We acknowledge that in his briefs to us, Sessoms expands the basis of his claim to incorporate his purported invocation of his right to counsel on November 20. We note, however, that the record is replete with examples of Sessoms's trial counsel seeking to exclude Sessoms's confession on the basis of his claimed invocation of his right to counsel on that date. We thus limit our review to Sessoms's claims regarding whether his November 15 invocation of his right to remain silent was "scrupulously honored."

rogation of Mosley from the circumstances of *Westover v. United States*, 384 U.S. 436 (1966) (companion case to *Miranda*), and found no violation. *Mosley*, 423 U.S. at 106-07 ("Here, by contrast, the police gave full '*Miranda* warnings' to Mosley at the very outset of each interrogation, subjected him to only a brief period of initial questioning, and suspended questioning entirely for a significant period before beginning the interrogation that led to his incriminating statement.").

[16] We conclude that the record in this case favors a similar result. Certainly, the mere fact that Sessoms had once invoked his right to remain silent would not categorically bar detectives Woods and Keller from trying to speak with him five days later. *Id.* at 104-06. To the contrary, *Mosley* itself permitted re-interview of the suspect a mere two hours after he initially refused to speak to police. *Id.* In addition, Sessoms's claim does not benefit from the Court's description of the elements of the right itself. Rather, the record plainly demonstrates that Sessoms not only raised no objection to the time, subject, or duration of the second interview that the detectives failed to scrupulously honor, but appeared to initiate and freely participate in the conversation.[19] Given the record in this case, we are hard pressed to see how *Mosley* is even implicated.

[17] Perhaps recognizing the infirmity of his claim, Sessoms contends that his willingness to speak to the detectives was immaterial because it was tainted by the detective's failure to refresh his *Miranda* warnings at the immediate onset of the second interview and their efforts to "cleverly, with tactics

---

[19]When Woods began the interview, Sessoms interjected to ask about the investigation and question whether he was entitled to a lawyer. While Woods was setting up the recorder, Sessoms again initiated conversation, asking whether it was necessary for police to have identified him through the media. Finally, after Woods told Sessoms that prior to any questioning regarding the crime, Sessoms would need to receive and waive his *Miranda* rights, Sessoms chose to talk.

borne of experience, . . . overcome his invocation of his right to silence . . . ." We are not persuaded. Though Sessoms's *Miranda* warnings were not refreshed at the immediate temporal onset of the second interview, we do not see how this transforms the interview into a *Mosley* violation. *Berghuis*, 130 S. Ct. at 2259; *Pheaster*, 544 F.2d at 368. The right articulated in *Mosley* was to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." 423 U.S. at 103-04. The record clearly indicates that Sessoms had, and exercised, such control. Furthermore, the record demonstrates that, as in *Mosley*, the police completely furnished the prophylactic safeguard of *Miranda* warnings before questioning Sessoms about the circumstances surrounding Sherriff's death. *Cf. id.* at 98 ("Before questioning Mosley about this homicide, Detective Hill carefully advised him of his '*Miranda* rights.' "); *see also Berghuis*, 130 S. Ct. at 2259.

**[18]** In regard to Sessoms's claim that the detectives coerced him into retreating from his position of silence, we also cannot agree. Simply put, there is no support in the record for his claim that he was coerced into retracting an invocation he made to different officers from a different department in a different city five days earlier. As has been discussed, the record demonstrates that from the temporal onset of the second interview Sessoms expressed no hint of a desire to remain silent. To the contrary, he initiated much of the pre-*Miranda* discourse. In addition, while Sessoms certainly possessed the ability to re-invoke his right to remain silent after initiating his conversation with the detectives, *Miranda*, 384 U.S. at 444-45, he never elected to do so. Instead, upon receiving his *Miranda* warnings for a second time prior to questioning, Sessoms chose to waive his rights, stating, "Let's talk."

**[19]** In short, Sessoms's counsel was not ineffective because he was right. On November 15, Sessoms declined to speak with the Langston police. He was not questioned again

until November 20. On that day, he elected not to invoke his right to remain silent and instead made incriminating admissions to Sacramento Detectives Woods and Keller. The fact that he now regrets that choice does not transform his second interview into something it was not—a *Mosley* violation. We discern no evidence to support Sessoms's claim that a *Mosley* violation even occurred, let alone that he was deprived of effective assistance of counsel when his trial counsel declined to pursue it. As such, we certainly cannot conclude that the decision of the state courts was contrary to, or an unreasonable application of, established federal law. *Premo*, 131 S. Ct. at 743; *see* § 2254(d). Sessoms is not entitled to the relief he seeks.

## IV

On the record before us, the district court properly concluded that the denial of Sessoms's claims by the state courts of California did not warrant issuance of a writ of habeas corpus under 28 U.S.C. § 2254.

**AFFIRMED.**

---

B. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent.

The Supreme Court has made clear that our review of a petition for a writ of habeas corpus filed post-AEDPA is significantly limited by 28 U.S.C. § 2254(d), *see Harrington v. Richter*, 131 S. Ct. 770 (2011). Such review, however, is not toothless. *Harrington* neither strips this court of the power to review state court decisions grounded in federal constitutional law, nor does it require that we "rubber stamp" such dispositions. Indeed, the Court has expressly acknowledged that AEDPA's "standard is demanding but not insatiable" and

" 'deference does not by definition preclude relief.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (alteration omitted) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2002)). A federal court's role in reviewing writs of habeas corpus implicating the fundamental rights of American citizens is a long-standing and crucially important one, and rarely has there been a case in which our obligation in discharging that role was more clear than in this one. When the government "take[s] a butcher knife to *Miranda* . . . a federal court can't sit idly by." *Doody v. Ryan*,___ F.3d ___, 2011 WL 1663551, at *38 (9th Cir. May 4, 2011) (Kozinski, C.J., concurring).

## I.

Sessoms, a naive and relatively uneducated 19-year-old boy, went, accompanied by his father, to turn himself in to the police for a serious crime. Sessoms's father left his son with one clear admonition: he must ask for a lawyer before talking to the police. At the police station, Sessoms was visited by two Sacramento city homicide detectives. Before any meaningful exchange took place, Sessoms followed his father's instructions and asked the detectives for an attorney. He first asked, "There wouldn't be any possible way that I could have a — a lawyer present while we do this?" As Detective Woods paused and stammered, Sessoms immediately reiterated his desire for counsel, explaining "that's what my dad asked me to ask you guys — uh, give me a lawyer." After requesting a lawyer with these two statements, Sessoms explained his concern that his words might be misrepresented if he did not have an attorney present.

Instead of complying with Sessoms's clear request for a lawyer, Detective Woods, evidently realizing that such a request had been made, dissuaded Sessoms from exercising his right. The detective reassured Sessoms that counsel was unnecessary because he was an "upfront and honest" guy who would not try to play any "switch games" with Sessoms, and

because he would record the conversation.[1] After starting the recording device, Detective Woods informed Sessoms that two other suspects had "waived [their] rights" and given statements incriminating Sessoms, but that he understood that there are "two sides to every story." The detective advised that a lawyer would probably prevent Sessoms from making a statement and being able to tell the police his "version of it."[2] He then refused Sessoms's request to call his father before speaking to him, telling Sessoms that he was an "adult." After undermining the instructions that Sessoms had received from his father and suggesting that it was in his best interest not to obtain counsel in response to his clear request to do so, the detective, for the first time, informed Sessoms of his *Miranda* rights. Then, without being allowed to consult with his father, Sessoms talked.

The state court's decision not to suppress the confession obtained under these circumstances does not withstand AEDPA review. I disagree with the majority's analysis of whether the state court's conclusion that Sessoms did not invoke his right to counsel was unreasonable. Sessoms's statements constitute an invocation of the right to counsel under *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the applicable precedent, and *Davis v. United States*, 512 U.S. 452, 459-60 (1994), the case applied by the state court. Because the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," Sessoms is entitled to habeas relief. 28 U.S.C. § 2254(d).

---

[1]Detective Woods's immediate response to Sessoms's two statements was "What — what we're going to go is, um — I have one philosophy and that's, uh, be right up-front and be honest . . . and not . . . try to hide anything from you, okay?" Sessoms then expressed the concerns that motivated his desire for counsel, to which Detective Woods responded, "No, we're not playing no switch games or nothing else."

[2]This "advice" was given to Sessoms before the detective informed him that he had a *right* to an attorney.

## II.

I rest my dissent on the state court's indefensible conclusion that Sessoms's statements did not constitute an invocation of the right to counsel. His two statements, which together constitute an unambiguous request for a lawyer, meet both the notably lenient *Edwards* standard and the post-waiver standard set forth in *Davis*. The contrary holding, endorsed by the majority, is an unreasonable application of federal law. It eviscerates the Fifth Amendment and the meaningful protections that *Miranda* affords.

### A.

The holding in *Edwards v. Arizona* makes clear the unreasonableness of the state court decision. As required by that case, Sessoms "expressed his desire" for the assistance of counsel, and was therefore "not subject to further interrogation by the authorities until counsel [had] been made available to him." *Edwards*, 451 U.S. at 484-85. "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *see also Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966) (holding that, if a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking[,] there can be no questioning"). These decisions, which constitute clearly established *Miranda* law, make clear that the standard for invocation of the right to counsel is not a rigorous one. A suspect's words are considered ambiguous only if "ordinary people would understand them" to be so. *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987). Notably, none of these cases sets forth a standard that even remotely resembles a "magic words" test. *Edwards*, *Miranda*, and *McNeil* instruct the court to determine whether an accused's statements, under a reasonable construction, convey the desire to have counsel present; that is exactly what

Sessoms's statements do. Despite the attempts of the state court and the majority opinion to dissect Sessoms's statements to find any other possible meaning to his words, no ordinary person would interpret his words as anything other than a request for a lawyer. In fact, the detective plainly understood that Sessoms had expressed a desire for counsel, which is precisely why he responded by persuading him that having a lawyer was a bad idea.[3]

Indeed, Sessoms's statements also meet *Davis*'s post-waiver requirement that a request for counsel be "unambiguous."[4] The *Davis* standard requires neither grammatical correctness nor fluid phrasing. *Davis* acknowledges that "a suspect need not speak with the discrimination of an Oxford don," 512 U.S. at 459, and, like its predecessors, makes no mention of any particular "magic words." Rather, *Davis* requires only sufficient clarity so that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

Unquestionably, a reasonable police officer would, as the detective did here, understand Sessoms's statements to be a request for counsel. He first politely requested to confer with counsel — "There wouldn't be any possible way that I could have a – a lawyer present while we do this?" — and then immediately clarified and reinforced his intention by stating "give me a lawyer." Neither Sessoms's words nor his inten-

---

[3]As the majority points out, the facts of this case are unique in that "individuals who desire counsel do not normally thereafter waive their *Miranda* right to counsel." This unlikely scenario presents itself here precisely because, after Sessoms expressed his desire for counsel, the request was ignored and he was instead persuaded to forgo this right.

[4]The suspect's statement in *Davis* that was insufficient to *restore* the right to counsel *after* it had been waived was "Maybe I should talk to a lawyer." 512 U.S. at 462. This statement, reflecting a measure of equivocation on the part of the speaker, is entirely different in kind from Sessoms's pre-waiver inquiry as to whether he could have a lawyer, followed by the explanatory words "give me a lawyer."

tion are in any way ambiguous. Indeed, the officer's telling response to Sessoms's request bolsters the conclusion that it meets the *Davis* standard. Upon being presented with the request, Detective Woods stammered and then launched into an explanation of why a lawyer was neither necessary nor advisable. He did this because he understood that a lawyer is exactly what Sessoms wanted.[5] When Sessoms asked the detective whether it would be possible for him to have an attorney present during questioning, the only correct response under *Miranda* was "yes." *Cf. United States v. Younger*, 398 F.3d 1179, 1184 (9th Cir. 2005) (when a suspect asked "But, excuse me, if I am right, I can have a lawyer present through all this, right?," the officers immediately responded "Yeah," and then read him his *Miranda* rights).

## B.

In analyzing why habeas relief should be granted, I do not simply rest on the conclusion that the state court reached the

---

[5]Notably, in addition to his failure to honor Sessoms's clearly stated request for counsel, the detective's subsequent attempt to dissuade Sessoms from consulting a lawyer raises a question as to whether Sessoms was adequately advised of his *Miranda* rights. In a recent en banc decision, *Doody v. Ryan*, we emphasized that *Miranda* requires a defendant be informed of his rights in a "clear and understandable" manner. *Doody v. Ryan*, ___ F.3d ___, 2011 WL 1663551, at *13-14 (9th Cir. May 4, 2011). As Chief Judge Kozinski notes in his concurrence, "[i]t's not too much to ask that police recite [*Miranda* warnings] as prescribed by the Supreme Court, and not . . . obscure their meaning and undermine their effect." *Id.* at *38 (Kozinski, C.J., concurring).

As in *Doody*, the detective in this case deliberately downplayed the importance of the right to counsel in persuading Sessoms that a lawyer was not necessary. Clearly, the primary issue in this case is the adequacy of Sessoms's initial invocation, rather than the adequacy of the detective's subsequent advisement; Sessoms does not challenge the propriety of the warnings. Nonetheless, that the detectives actively undermined Sessoms's understanding of his right only further indicates that their failure to provide him with counsel upon his initial request was deliberate, strategic, and unlawful.

incorrect result. I readily accept the majority's repeated challenge to demonstrate "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87. "Fairminded" disagreement is disagreement that is "unprejudiced, just, judicial, [and] honest." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 816 (2002). The state court's conclusion, and the majority's endorsement of it, are entirely without justification, and therefore fail to withstand AEDPA review.

First, both the state court and the majority attempt to obscure the clear nature of Sessoms's request by breaking apart his successive statements and attacking each one individually. This analysis, however, ignores the fact that, as reflected in the transcript and the video, these statements work together as an expression of one complete thought. Sessoms asked "There wouldn't be any possible way that I could have a — a lawyer present while we do this?" and then immediately explained "*that's* what my dad asked me to ask you guys — uh, *give me a lawyer*." (emphasis added). "Give me a lawyer," therefore, refers back to and makes absolutely clear what was expressed in the first, more polite, inquiry. When the successive requests are read together and in light of one another, there remains no reasonable argument to support the state court's conclusion. As spoken, Sessoms's words are subject to only one rational interpretation — he was asking to consult with a lawyer.

The state court entirely failed to consider what the statements mean when read together, or precisely how Sessoms conveyed them. This failure is fatal to the state court's application of *Davis* and *Edwards*, that is, to its assessment of how a reasonable police officer would have understood Sessoms's statements, because the detectives did in fact hear *both* statements, one immediately following the other. Nothing in *Miranda*, *Edwards*, *Davis*, or any other case can be read to

support the contention that an invocation of the right to counsel must be made in a single sentence, rather than in two successive statements. The state court failed to appreciate the clarity of the request *in its entirety*, instead breaking it apart and unreasonably concluding that the pieces are inadequate.

If this failure is not itself reason enough to grant relief, the attempts to undermine Sessoms's individual statements are also without merit. As to his first statement, "There wouldn't be any possible way that I could have a — a lawyer present while we do this?", the contention that Sessoms was inquiring only as to whether he could request counsel is nothing more than an irrelevant lesson in grammar. Both the state court and the majority opinion pay mere lip service to the rule that a criminal defendant need not speak with "the discrimination of an Oxford don" and then proceed to attack the grammatical structure of Sessoms's sentence to conclude that he was asking a clarifying question rather than invoking his right.**[6]**

---

**[6]**This reasoning runs directly afoul of *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999), where we construed the suspect's statements ("[c]an I get an attorney right now, man?", "[y]ou can have an attorney right now?", and "[w]ell like right now you got one?") to be unambiguous requests for counsel rather than clarifying questions regarding the right to counsel. *Accord Clark v. Murphy*, 331 F.3d 1062, 1070-72 (9th Cir. 2003) (holding that the state court's conclusion that a suspect did not unambiguously request counsel was not unreasonable when, during a post-*Miranda* interview, the suspect stated, "I think I would like to talk to a lawyer," after which the police stopped questioning him, left the room, and did not resume questioning until the suspect explicitly said he did not want a lawyer and wanted to continue talking). Although *Alvarez* does not serve as "clearly established law" for purposes of AEDPA, it remains the law of this circuit and serves as persuasive authority in evaluating on habeas review the reasonableness of the state court's application of federal law. *See Mejia v. Garcia*, 534 F.3d 1036, 1042 (9th Cir. 2008); *Clark*, 331 F.3d at 1071 (identifying, under AEDPA review, *Alvarez* and other circuit cases as possible persuasive authority).

The majority attempts to undermine the relevance of *Alvarez* by stating in a footnote that "[a]t best, circuit precedent may serve as persuasive authority," and then citing *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11

Though he may, understandably, have phrased the request timidly, Sessoms nonetheless made clear to any reasonable listener his desire to have counsel present during his conversation with the police.

Apparently, the state court simply thought that Sessoms's wording was too polite. Because he inquired whether he could ask for a lawyer, rather than demanding one, the court concluded that he is not entitled to his Fifth Amendment right.[7] If this or any other court demands such specificity and precision in invoking the right to counsel, particularly before it has been knowingly waived, the right will operate for only those educated individuals who have at their disposal the vocabulary and self-assuredness of my colleagues in the majority. This is precisely the standard for invocation that *Davis* expressly forbids. 512 U.S. at 459. The state court's error, therefore, was "well understood and comprehended in existing law." *Richter*, 131 S. Ct. at 786-87.

The second statement made by Sessoms was "that's what my dad asked me to ask you guys — uh, give me a lawyer."

---

(2011) with a "But see" signal. *Pinholster* reasons only that the Supreme Court cases that the lower court had relied upon offered limited guidance as direct authority because they lacked the "doubly deferential" standard of *Strickland v. Washington*, 466 U.S. 668 (1984), and AEDPA; it neither addresses nor undermines the established principle that this circuit's law, whether decided under AEDPA or not, serves as persuasive authority as to the reasonableness of a state court's application of existing Supreme Court precedent. *Pinholster*, 131 S. Ct. at 1410-11; *see, e.g.*, *Kessee v. Mendoza-Powers*, 574 F.3d 675, 677-78 (9th Cir. 2009); *Clark*, 331 F.3d at 1071-72; *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000); *MacFarlane v. Walter*, 179 F.3d 1131, 1138-39 (9th Cir. 1999).

[7]To reiterate, Sessoms went on to explain his request when he immediately said, "*that's* what my dad asked me to ask you guys — uh, *give me a lawyer*." (emphasis added). The rationale of the state court and the majority is therefore meritless, as Sessoms did in fact make a more forceful request for counsel that referred back to and explained his initial polite inquiry.

As explained above, this statement is plainly a clarification of the request made in Sessoms's first inquiry, i.e. to consult with counsel. The assertion that, in so stating, Sessoms was conveying the will of his father rather than his own is simply incorrect when the statement is read with his first inquiry. Furthermore, even in isolating Sessoms's second statement from his first, the state court was still faced with the magician's task of convincing us that "give me a lawyer" does not really mean "give me a lawyer." The court failed, however, to pull the rabbit out of its hat.

The situation presented is straightforward. A 19-year-old, upon the advice and with the assistance of his father, turned himself in to the police. His father instructed that, prior to talking to the police, he should ask for counsel. In executing these instructions to the best of his ability, the young man told the police that his request was on the advice of his father. This fact in no way affects the validity of the underlying request. Indeed, Sessoms's preface about his father's advice, if anything, reinforced and clarified that he was requesting counsel pursuant to the instructions he had received. *See Smith v. Illinois*, 469 U.S. 91, 96-97 (1984) (reversing a state court decision that failed to point to anything "inherent in the nature of [the suspect's] actual request for counsel that reasonably would have suggested equivocation" other than the use of "uh", and noting that the suspect's assertions that "she" warned him that the police would "railroad" him and advised him to get a lawyer before submitting to interrogation *reinforced* the clarity of the suspect's invocation). The state court's reasoning cannot be squared with clearly established law on this very issue.

Simply stated, when Sessoms said "give me a lawyer " he meant give me a lawyer, regardless of whether the request was on the advice of his father, his priest, or his law school professor. If any words could invoke the right to counsel guaranteed by the Fifth Amendment, these are they — there is no room for disagreement on this point. At the moment Ses-

soms uttered these words, the police should have ceased questioning and counsel should have been provided.[8]

The majority's affirmation of what it calls a "harsh" application of the law is an attempt to justify the state court's indefensible conclusion that this young man did not request counsel before he was read his *Miranda* rights. The suggestion that Sessoms's "inflection, body language, and manner" support the state court's conclusion, despite what the transcript reflects, is perplexing. As I review the video, Sessoms's body language, demeanor, and tone of voice do nothing to alter the clear thrust of his language. If anything, his posture and the position of his arms indicate that perhaps he feels scared — or just cold. It is as if the majority is curiously attempting to resurrect the once-familiar maxim that "your words said no but your body language said yes."

Habeas relief should be granted not merely because the state court's application of *Miranda* law is incorrect. Rather, relief should be granted because the state court's reasoning is contrary to the Supreme Court's clear mandate that when a suspect "expresses his desire" to have counsel present, questioning must cease. *See Edwards*, 451 U.S. at 484-85. Its reasoning cannot be reconciled with the instruction that a suspect need not speak with the "discrimination of an Oxford don" when making his request. *See Davis*, 512 U.S. at 459. Its reasoning is directly at odds with the Court's direction that an expression of reliance on the advice of a third party does not create ambiguity, but rather reinforces the clarity of an invocation. *See Smith*, 469 U.S. at 96 n.4. And its conclusion is directly opposed to the Fifth Amendment itself, because an irrational holding that "give me a lawyer" does not mean give me a lawyer eviscerates the right to counsel completely.

---

[8]That Sessoms continued to respond to the detectives' questions after requesting counsel has no bearing upon the validity of his initial invocation. "Under *Miranda* and *Edwards* . . . an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Smith*, 469 U.S. at 92.

## III.

I also disagree with the state court's decision to apply the standard announced in *Davis* to the facts of this case. A state-court decision is an unreasonable application of federal law under AEDPA when it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000).[9] The state court's application of *Davis* to the pre-waiver context is just such an unreasonable extension.

*Davis* held that, *after* a suspect has chosen to *waive* his right to counsel, his *subsequent* request for counsel must be unambiguous. 512 U.S. at 459. The Court was not silent on the issue of whether its holding should apply in the pre-waiver context. The articulated *Davis* holding is as follows: "[*A*]*fter a knowing and voluntary waiver of the* Miranda *rights*, law enforcement officers may *continue* questioning until and unless the suspect clearly requests an attorney." *Id.* (emphasis added). The language and analysis of *Davis* itself, therefore, compels the conclusion that its application is inappropriate in the pre-waiver context. It addresses only what a suspect must do to *restore* the right to counsel after it has been knowingly disavowed, not the degree of clarity with which a suspect must invoke the right in the first instance. Indeed, it is well settled that "[i]nvocation and waiver [of *Miranda* rights] are

---

[9]*Williams*, therefore, expressly acknowledges that AEDPA allows us to evaluate whether the state court has unreasonably extended Supreme Court precedent to a new context. This disposes of the majority's suggestion that, merely because the Supreme Court has never held against the application of a particular legal principle to a specific factual circumstance, AEDPA review is foreclosed. *Williams* leaves open only the question of whether an unreasonable extension of Supreme Court law falls under the "unreasonable application" or the "contrary to" clause of § 2254(d)(1), noting that the analysis can, depending on the case, be treated under both. 529 U.S. at 408. Regardless, *Williams*'s clear instruction that a state court may not *unreasonably* extend Supreme Court precedent to a new context where it should not apply remains good law.

entirely distinct inquiries, and the two must not be blurred by merging them together." *Smith*, 469 U.S. at 98. In simply reciting and applying the *Davis* test, the state court ignored the reasoning and underlying facts that justified the rigor of *Davis*'s approach. The manner in which the state court applied *Davis* runs directly afoul of both *Smith* and *Davis*.[10]

Because Sessoms's statements nonetheless satisfy the Davis requirement for a post-waiver request, there is no need to decide the question of whether *Davis* should have applied at all. Therefore, though I believe the issue worth noting, I do not rest my dissent on the state court's decision to apply *Davis* to the pre-waiver context.

---

[10]This circuit has clearly held that *Davis*'s test is limited to the post-waiver context. In *United States v. Rodriguez*, 518 F.3d 1072, 1078-79 (9th Cir. 2008), we examined the language in *Davis* and concluded that the "clear statement" rule in *Davis* "addresses only the scope of invocations of *Miranda* rights in a post-waiver context." We further explained that "*Davis* addressed what the suspect must do to restore his *Miranda* rights after having already knowingly and voluntarily waived them. It did not address what the police must obtain, in the initial waiver context, to begin questioning." *Id.* at 1079. Indeed, "[t]he existence of a prior waiver explains how *Davis* can be reconciled with the Supreme Court's historic presumption against finding waiver of constitutional rights." *Id.* We have explicitly recognized, therefore, that *Davis* does depart in some measure from precedent, and is therefore appropriately applied only in a limited context.

The state court, nevertheless, applied Davis to the pre-waiver context. Although I fully recognize that the law of this circuit does not bind state courts, I reiterate the well-settled principle that our decisions may be used as persuasive authority to determine if a state court's decision is an "unreasonable application" of clearly established federal law, or whether the law is "clearly established." *Mejia*, 534 F.3d at 1042; *Duhaime*, 200 F.3d at 600-01. *Rodriguez* fully explains why extending *Davis* to the post-waiver context is unreasonable, and it is consistent with the decisions of other jurisdictions. 518 F.3d at 1079 n.6. *Rodriguez* is not, as the majority contends, "immaterial," but rather serves as relevant, persuasive authority on the issue of how *Davis* reasonably can be applied.

## IV.

Though review under AEDPA is limited, it is not, as the majority would have it, a nullity. "[W]here, as here, a state court doesn't act reasonably, deference comes to an end." *Doody*, 2011 WL 1663551, at *38 (Kozinski, C.J., concurring). *Edwards* and *Miranda* establish that, once a suspect has indicated a desire to consult with counsel, all questioning must cease. Sessoms's statements meet this standard, which is not a rigorous one, as they do the post-waiver standard set out in *Davis*. The state court and majority's empty attacks on Sessoms's grammar, tone, and body language create unreasonable and grossly prejudicial barriers to the invocation of the right to an attorney that contravene clearly established law.

Moreover, the majority's holding creates particular injustice for the poor and less educated, who often regard law enforcement with uncertainty or timidity but for whom counsel and representation are most critical. By waving its wand and declaring the words "give me a lawyer" insufficient to request a lawyer, the state court, with the help of the majority, has made *Miranda* rights disappear. Sessoms's habeas petition should be granted.