

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00019-CR

———————————————

EDWARD MICHAEL PAUTENIS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR14699

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Edward Michael Pautenis appeals the trial court's judgments convicting him of murder and tampering with physical evidence. *See* Tex. Penal Code Ann. §§ 19.02(b), 37.09(a). On appeal, Pautenis argues in two issues that the trial court erred by (1) overruling Pautenis's motion to suppress certain recorded statements that he made after purportedly invoking his right to counsel during a custodial interrogation and (2) admitting evidence that was derived from these custodial statements. We affirm.

## I. BACKGROUND

On October 22, 2019, James Luckie, an investigator for the Hood County Sheriff's Office, responded to a call requesting a welfare check for Pautenis's wife, Jennifer. A co-worker had requested the welfare check after Jennifer had failed to show up to work for "a couple of days." Upon arriving at the Pautenises' residence in Granbury, Luckie found no one at home and saw no obvious signs of foul play. Luckie tried to call Pautenis and Jennifer but was unable to contact either of them. Later that day, Pautenis returned Luckie's call and told him that Jennifer had left with another man. He explained that he and Jennifer had an open marriage and that it was not unusual for her to go off with other men for long periods of time.

Shortly thereafter, Luckie started getting phone calls from Jennifer's family members in Florida. They were concerned because Jennifer had not been active on

2

social media for several days, which was highly unusual for her. Based on the family members' concerns, Luckie began a missing person investigation.

On October 25, 2019, Luckie returned to the Pautenises' house, and Pautenis gave him a detailed account of the night that Jennifer had supposedly left with another man. While there, Luckie noticed a white Dodge van parked out front.

The Hood County Sheriff's Office requested that the Texas Rangers assist with the investigation, and in early November 2019, Ranger Don Stoner interviewed Pautenis, who stated that he had nothing to do with Jennifer's disappearance and vehemently denied killing her. After Stoner's interview, fellow Ranger Danny Briley was assigned to the investigation.

On November 14, 2019, Luckie and fellow officers returned to the Pautenises' residence and—with Pautenis's consent—conducted a search with the aid of a cadaver dog. During the search, Luckie noticed that the white Dodge van that he had seen on his previous visit was not at the house. When Luckie asked Pautenis where the van was, he told him that it was in a storage facility in Fort Worth, but Pautenis refused to disclose the name of the storage facility because "it was his personal business."

Shortly thereafter, Luckie received a tip from some of Jennifer's family members that the van had been located at a business in Florida where Pautenis had previously worked before moving to Texas. On November 15, 2019, Luckie and

another investigator traveled to Florida to retrieve the van. After a search, blood was found on the weather stripping around the van's back hatch.

On December 4, 2019, Ranger Briley arrested Pautenis for tampering with evidence because he had moved the van from Hood County to Florida. After taking Pautenis into custody, Briley interviewed him.[1] Prior to beginning the interview, Pautenis was provided with water, and his handcuffs were moved to the front of his body to help him feel more comfortable. The officers also procured him a lunch so that he would not be hungry. At the start of the interview, Briley read Pautenis his *Miranda* rights,[2] and Pautenis stated that he understood them.

At one point during the interview, while discussing the blood evidence found in the van, Pautenis stated,

> I don't know where else I'm supposed to go at this point. I mean, I'd like to talk to a lawyer or something, but I don't even know if that will do anything for me in this. It's just . . . I just . . . I don't understand a lot of this if you can understand that.

Briley then paused for several seconds before asking his next question. Pautenis answered, causing the interview to proceed. As the interview continued, Pautenis ultimately admitted to killing Jennifer and agreed to show Briley where he had disposed of her body.

---

[1]The entire interview was recorded, and the recording was admitted as an exhibit at Pautenis's trial.

[2]*See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612 (1966).

4

After the interview, Pautenis took Briley to the rural area in which he had disposed of Jennifer's remains. Following a search, officers found a skull with what appeared to be a bullet hole in it, as well as other bones. DNA testing confirmed that these bones and the blood found in the Dodge van's weather stripping almost certainly came from Jennifer.

Pautenis also took officers to a separate location where he had disposed of the weapons that he had used to kill Jennifer. After a canine-assisted search, officers recovered a .25 caliber pistol and two black barrels for a small .22 caliber rifle.

Pautenis was indicted for murder and tampering with evidence. Before trial, Pautenis filed a motion to suppress the statements that he had made to Briley during his December 4, 2019 custodial interview. At the hearing on his motion to suppress, Pautenis argued that his statement during the interview that, "I'd like to talk to a lawyer or something, but I don't even know if that will do anything for me in this," constituted an unambiguous request for counsel, and therefore, any statements that he made afterward—including his statements admitting to killing Jennifer and directing officers to where he had disposed of her remains and the murder weapons—were inadmissible. When questioned at the hearing, Pautenis repeatedly testified that when he stated that "[he'd] like to talk to a lawyer or something," he was asking for a lawyer. Ranger Briley, who has a great deal of experience in interrogating murder suspects, testified that he believed that Pautenis had understood and voluntarily waived his *Miranda* rights during the interview. According to Briley, Pautenis's statement was not

an unambiguous request for an attorney because Pautenis "was not clear with what . . . he wanted to happen," making his statement open to interpretation. At the conclusion of the hearing, the trial court denied Pautenis's motion to suppress.[3]

Despite the denial of his motion to suppress, Pautenis pleaded not guilty.[4] After the presentation of evidence, a jury found Pautenis guilty on both counts and assessed his punishment at life in prison and a $10,000 fine on the murder count and 10 years in prison and a $10,000 fine on the tampering-with-evidence count. This appeal followed.

## II. DISCUSSION

## A. The Trial Court Did Not Err by Denying Pautenis's Motion to Suppress

In his first issue, Pautenis asserts that he unambiguously invoked his right to counsel during his custodial interrogation and that, therefore, the trial court erred by denying his motion to suppress. We disagree.

### 1. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019).

---

[3]Because Pautenis's motion to suppress raised a question as to the voluntariness of certain statements he made during his custodial interrogation, the trial court made findings of fact regarding whether the statements were "made under voluntary conditions" as required by the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6.

[4]At trial, Pautenis unsuccessfully argued that he had killed Jennifer in self-defense.

6

Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281. Whether a statement was made voluntarily is an application-of-law-to-fact question that we review in the light most favorable to the trial court's ruling. *State v. Lujan*, 634 S.W.3d 862, 865–66 (Tex. Crim. App. 2021).

When, as here, the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). Regardless of whether the motion was granted or denied, the prevailing party must be afforded the "strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *See State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). But we review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

## 2. Custodial Statements and the Invocation of the Right to Counsel

Article 38.22, Section 3(a)(2) of the Texas Code of Criminal Procedure prohibits the admission of any oral statement made by an accused during custodial interrogation unless certain conditions are met. Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2). As relevant here, the accused must be warned of his *Miranda* rights "prior to the statement" and must "knowingly, intelligently, and voluntarily" waive these rights. *Id.* "The required order is to warn first, waive second, and confess third." *Lujan*, 634 S.W.3d at 865. The State has the burden of proving by a preponderance of the evidence not only that the accused was advised of his rights but also that he knowingly, intelligently, and voluntarily waived them. *See Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). Only "warned and waived" custodial statements are admissible in evidence. *Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008).

To qualify as knowing, intelligent, and voluntary, a waiver must satisfy two distinct requirements: "[i]t must be 'the product of a free and deliberate choice rather than intimidation, coercion, or deception,'" and it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Lujan*, 634 S.W.3d at 865 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382–83, 130 S. Ct. 2250, 2260 (2010)). "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda*

8

rights have been waived." *Joseph*, 309 S.W.3d at 25 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986)). "The 'totality-of-the-circumstances approach' requires the consideration of 'all the circumstances surrounding the interrogation,' including the defendant's experience, background, and conduct." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2572 (1979)).

When a suspect invokes his Fifth Amendment right to counsel, interrogation must cease until counsel has been provided or the suspect initiates further communication with the police. *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010). "This secondary *Miranda* right is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights[.]'" *State v. Munoz*, No. 08-16-00023-CR, 2018 WL 1517006, at *9 (Tex. App.—El Paso Mar. 28, 2018, no pet.) (not designated for publication) (quoting *Davis v. U.S.*, 512 U.S. 452, 458, 114 S. Ct. 2350, 2355 (1994)).

To trigger law enforcement's duty to terminate the interrogation, a suspect's request for counsel must be clear and unambiguous. *Berghuis*, 560 U.S. at 381, 130 S. Ct. at 2259 (quoting *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355); *Davis*, 313 S.W.3d at 339. Thus, "the mere mention of the word 'attorney' or 'lawyer,' without more, does not automatically invoke the right to counsel." *Munoz*, 2018 WL 1517006, at *9 (citing *State v. Gobert*, 275 S.W.3d 888, 892–93 (Tex. Crim. App. 2009)). The police are not required to attempt to clarify a suspect's ambiguous references to counsel. *Davis*, 313 S.W.3d at 339 (citing *Davis*, 512 U.S. at 461–62, 114 S. Ct. at 2356).

9

"Whether a statement referring to a lawyer constitutes a clear request for counsel depends on the statement itself and the totality of the circumstances surrounding the statement." *Id.* (citing *Gobert*, 275 S.W.3d at 892). Although there are no "magical words" required to invoke a suspect's right to counsel, at a minimum, the suspect must "express a definite desire to speak to someone, and that person be an attorney." *Dinkins v. State*, 894 S.W.2d 330, 352 (Tex. Crim. App. 1995) (citing *Russell v. State*, 727 S.W.2d 573, 576 (Tex. Crim. App. 1987)). In assessing a suspect's statement, we apply an objective test: did the suspect "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355; *accord Davis*, 313 S.W.3d at 339 (quoting *Gobert*, 275 S.W.3d at 892–93).

### 3. Pautenis Did Not Invoke His Right to Counsel

Pautenis complains that his statements admitting to killing Jennifer and directing law enforcement to the locations of both her remains and the murder weapons were inadmissible because Ranger Briley failed to honor Pautenis's request for an attorney. *See* Tex. Code Crim. Proc. Ann. arts. 38.21, 38.22, § 3(a)(2); *Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003). Specifically, he claims that his statement, "I'd like to talk to a lawyer or something, but I don't even know if that would do anything for me in this," constituted an unambiguous invocation of his right to counsel and that Ranger Briley failed to honor that invocation. We disagree.

10

In *Davis v. U.S.*, the Supreme Court, applying the objective test set forth above, held that the statement, "Maybe I should talk to a lawyer," was not sufficiently clear to invoke the right to counsel. 512 U.S. at 462, 114 S. Ct. at 2357. Applying this same standard, courts have held that the following statements were ambiguous and therefore insufficient to invoke the right to counsel:

- "I might want to talk to an attorney";

- "I think I need a lawyer";

- "Do you think I need an attorney here?"; or

- "I can't afford a lawyer[,] but is there any[]way I can get one?"

*In re H.V.*, 252 S.W.3d 319, 325 (Tex. 2008) (citations omitted). On the other hand, courts have held that a suspect invoked his right to counsel by stating:

- [That] he did not "want to make a statement at this time without a lawyer";

- "Uh, yeah. I'd like to do that" in response to a question whether he understood his right to counsel;

- "Maybe I should talk to an attorney by the name of William Evans" and proffering that attorney's business card;

- "Can I get an attorney right now, man?"; or

- "I'd just as soon have an attorney 'cause, you know—[y'all] say there's been a shooting."

*Id.* at 326 (citations omitted).

Pautenis's statement falls into the ambiguous category. *Cf. Clark v. Murphy*, 331 F.3d 1062, 1066 (9th Cir. 2003) (holding that suspect's statement, "I think I would like

11

to talk to a lawyer," was ambiguous). Even if Pautenis's words, "I'd like to talk to a lawyer or something"—taken by themselves—could be considered sufficiently clear to invoke the right to counsel, *see Dinkins*, 894 S.W.2d at 352 (explaining that to invoke the right to counsel, a suspect must, at a minimum, express the desire to speak to someone and that person must be an attorney), these words were not spoken in isolation. The second part of his statement, "but I don't even know if that would do anything for me in this," blurs the meaning and renders his statement ambiguous. *Cf. Vieira v. State*, No. 08-16-00100-CR, 2018 WL 3084155, at *4 (Tex. App.—El Paso June 22, 2018, no pet.) (not designated for publication) (concluding that although "the simple declarative statement, 'It's time to talk to a lawyer' would leave little room for doubt that a suspect had invoked the right to counsel," the suspect's statement, "I am thinking it's time to talk to a lawyer, I guess," was ambiguous because the additional words that the suspect used "express[ed] some manner of equivocation"). Taken in its entirety, Pautenis's statement could still be interpreted as a request for counsel, but it could also reasonably—and perhaps best—be understood as the mere verbalization of Pautenis's thoughts assessing his situation and contemplating the possible benefits of speaking to an attorney.[5] Because Pautenis's statement is fairly susceptible to more than one meaning, a reasonable police officer would not necessarily understand it to

---

[5]Indeed, Ranger Briles testified that he thought that Pautenis's statement indicated that he was probably "pondering . . . where he was" and the possible benefits of speaking to an attorney.

be a request for an attorney. Therefore, it fails the objective test.[6]  *See Davis*, 512 U.S. at 459, 114 S. Ct. at 2355; *accord Davis*, 313 S.W.3d at 339.

Having determined that Pautenis did not invoke his right to counsel, we conclude that the trial court did not err by denying Pautenis's motion to suppress. Accordingly, we overrule Pautenis's first issue.

## B.  The Fruit-of-the-Poisonous-Tree Doctrine Does Not Apply

In his second issue, Pautenis argues that the trial court erred by admitting evidence derived from the statements that Pautenis made after purportedly invoking his right to counsel because such evidence constitutes "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 484, 487–88, 83 S. Ct. 407, 415–18 (1963) (explaining "fruit of the poisonous tree" doctrine); *see also* Tex. Code Crim. Proc. Ann. art. 38.23(a) (prohibiting evidence obtained in violation of a constitutional right from being admitted against accused in trial of criminal case).  But because Pautenis did not invoke his constitutional right to counsel, the fruit-of-the-poisonous-tree doctrine does not apply.  *See Nix v. Williams*, 467 U.S. 431, 442–43, 104 S. Ct. 2501, 2508 (1984) (explaining that the purpose of fruit-of-the-poisonous-tree doctrine is to "deter

---

[6]Pautenis argues that his statement is similar to the statement, "I think I want a lawyer," which the Court of Criminal Appeals agreed "was a clear and unequivocal assertion" of the appellant's right to counsel in *Jones v. State*.  742 S.W.2d 398, 405–06 (Tex. Crim. App. 1987).  However, because *Jones* was decided before *Davis v. U.S.*, the Court of Criminal Appeals did not apply the Supreme Court's objective test in assessing the sufficiency of the suspect's statement.  Thus, even if we were to agree with Pautenis regarding the similarity of the two statements, it would not necessarily follow that his statement passes *Davis*'s objective test.

police from violations of constitutional and statutory protections"). Therefore, we overrule Pautenis's second issue.

### III. CONCLUSION

Having overruled both of Pautenis's issues, we affirm the trial court's judgments of conviction.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 25, 2024